**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Norman Anthony KING, aka Norm**
**King, aka Norman August Klause,**
**Defendant–Appellant.**

No. 99–10478.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 13, 2000

Filed April 13, 2001

As Amended July 20, 2001

Second Amendment Aug. 3, 2001

---

6. We express no opinion as to whether the defense of qualified immunity applies to the remanded claims.

Suzanne A. Luban, Berkeley, California, for the defendant-appellant.

Robert T. Swanson, Assistant United States Attorney, Appellate Section, San Francisco, California, for the plaintiff-appellee.

Before: GRABER, FISHER and BERZON, Circuit Judges.

FISHER, Circuit Judge:

## ORDER

The opinion filed April 13, 2001 is amended as follows:

At slip op. 4634, delete the paragraph beginning "Application of the 1995 Guidelines...." Insert the following paragraph in its place:

The 1994 Guideline version of § 5G1.3(c) is more favorable to King than the 1995 Guideline version. *United States v. Chea,* 231 F.3d 531, 539–40 (9th Cir.2000). Thus, the district court must apply the 1994 Guidelines on remand in determining whether and to what extent to run the new sentence concurrently to King's prior undischarged term of imprisonment. In doing so, it must either apply the methodology described in the Guideline commentary or provide a good reason for not doing so. *Id.* at 536; *United States v. Redman,* 35 F.3d 437, 441 (9th Cir.1994). If the court chooses the latter course, it must explain its decision on the record in a way that indicates it has considered the commentary methodology. *Id.*

At slip op. 4631, delete the sentence reading "These claims are of dubious weight, especially given King's prior perjury conviction."

With these alterations, Appellant's Petition for Panel Rehearing, filed April 26, 2001, is DENIED.

## OPINION

Defendant–Appellant Norman King appeals his conviction and sentence on 19 counts of a 50–count indictment. The indictment charged him with engaging in three mail fraud schemes, using counterfeit postage meter stamps and money laundering. Though he pled guilty to the 19 counts, he now challenges the validity of the plea, as well as the district court's application of the United States Sentencing Guidelines ("U.S.S.G.") and the amount of restitution imposed. The government, in addition to disputing King's contentions, argues that this court lacks jurisdiction to hear the appeal under 28 U.S.C. § 1291. We conclude that jurisdiction is proper. We affirm the conviction but vacate the sentence and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Indictment

On May 10, 1995, a grand jury in the Northern District of California returned an indictment charging King with 40 counts of mail fraud (in violation of 18 U.S.C. § 1341), one count of using a counterfeit postage meter stamp (in violation of 18 U.S.C. § 501) and nine counts of money laundering (in violation of 18 U.S.C. § 1957). The indictment alleged that King had engaged in three fraudulent schemes.

Under the first such scheme (summarized in counts 1 through 5 of the indictment), he allegedly mailed postcards to recipients located throughout the United States informing them that they had been selected as winners in the "$25,000 Win–A–Fortune Contest," and were required to return the postcard along with $10 for processing fees within seven days to claim their prize. Recipients who wished to check on the status of their prizes were instructed to call one of three numbers on the postcard, two of which were "900" numbers imposing a $9.95 per minute charge on the caller. The recording available through these numbers restated the information on the postcard.

Under the second allegedly fraudulent promotion, King sent out mailers with information about missing children on the front and an offer for a free camera and 100 rolls of film on the back. Recipients were instructed to send $10 in shipping, handling and insurance costs in order to take advantage of the offer. Counts 6 through 22 concern this promotion.

The third scheme in the indictment— and the one to which King initially pled guilty—involved mailing postcards marked "FINAL NOTICE" informing recipients that they had been selected as winners in a $10,000 sweepstakes. To collect, recipi-

ents were instructed to send a $10 "processing fee," as well as an additional $5 for "Rush Handling," within 14 days. The parties dispute how many such postcards were sent out. The government estimates that King mailed 1.7 million postcards, while King claims that the number is much lower. He admitted sending more than 10,000 such postcards, but could not recall whether the number exceeded 50,000. Counts 24 through 41 are related to the "Final Notice" scheme.[1]

Count 42 of the indictment, to which King also pled guilty initially, alleged that he had used a counterfeit postage meter stamp to avoid paying the postage on approximately 1.7 million postcards in connection with the "Final Notice" scheme. The government alleged that King owed at least $302,940 in postage costs.

The final nine counts, alleging violations of the federal money-laundering statute, are not at issue in this appeal.

### B. King's Plea

At a July 20, 1999 status hearing, King informed the court that he wished to plead guilty to counts 24 through 42 of the indictment. In response to questioning from the court, King stated he had discussed with his attorney the nature of the charges against him, the necessary elements of proof and possible defenses. He also said he was satisfied with the representation he had received. When asked specifically about the "Final Notice" scheme charges to which he was pleading guilty, King stated that he had intended to pay out shares of a $10,000 fund to all recipients who responded to his mailing, but failed to send payments to 18 of them. The government contended King's statement failed to make out a factual basis for mail fraud because he had not admitted making false state-

---

1. The indictment contains no count 23.

ments in the postcards. King responded, "I'm not pleading guilty to any false statements because as far as I'm concerned there were no false statements. I'm pleading guilty to mail fraud for non-fulfillment of prizes." Despite the government's concerns, the court accepted King's plea after determining that it was made intelligently and voluntarily. Still fearing the factual basis for the plea might be lacking, the government filed a "Further Submission by Government in Support of Factual Basis for Guilty Pleas," in which it argued that additional evidence in the record supported a finding that the postcards contained false statements and that King intended to defraud the recipients.

At a hearing on August 31, 1999, King's attorney objected to the government's proposed submission and argued that the factual basis from the earlier hearing was adequate to allow for sentencing. The court found the prior record was sufficient to demonstrate King's admission of guilt was knowing, intelligent and uncoerced. It sentenced King to 71 months in prison and ordered him to pay $302,000 in restitution to the United States Postal Service.

At a hearing on September 14, 1999, King moved to withdraw his earlier plea, contending his actions did not meet the legal definition of mail fraud and that he would not have pled guilty if he had known the potential extent of his sentence. The court proposed holding another hearing October 5 to give King an opportunity to consult with his lawyer about the wisdom of withdrawing his plea in the interim. King did not agree to this delay, as it would have entailed waiver of his rights under the Speedy Trial Act. At the close of the hearing, the court again proposed conducting another status hearing on October 5. The record does not reflect whether this proposed status conference ever took place.

Judgment was entered December 17, 1999, relating back nunc pro tunc to the sentencing dates, August 31, 1999 and September 14, 1999. King filed a timely notice of appeal.

## DISCUSSION

### A. Jurisdiction

■ The government argues this court lacks jurisdiction to hear the appeal under 28 U.S.C. § 1291 because the judgment in the district court is not "final," given the 31 counts of the indictment yet to be adjudicated. Under § 1291, "the courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts." 28 U.S.C. § 1291. "Final judgment in a criminal case means sentence. The sentence is the judgment." *Berman v. United States*, 302 U.S. 211, 212, 58 S.Ct. 164, 82 L.Ed. 204 (1937). The government notes that, while King pled guilty to and was sentenced on counts 24 through 42 of the indictment, the remaining counts are still pending in the district court. Therefore, it contends, we do not have jurisdiction to hear King's appeal, because the district court's judgment was not "final" as to the entirety of the indictment.

This court addressed this general issue in *United States v. Powell*, 24 F.3d 28 (9th Cir.1994). There, the defendant had been indicted on four counts, including a charge of being a felon in possession of a firearm. Powell successfully moved to sever the firearm charge, was convicted on the other three and immediately appealed the conviction. In a separate trial, he was convicted of the felon-in-possession charge, and he appealed that conviction as well. On appeal, we addressed whether the district court's jurisdiction over the second conviction was proper, given that the appeal on the first conviction was pending. Concluding that "[s]everance is analogous to charging the defendant in two separate

indictments," we held that the final judgment rule had not been violated, despite the possibility that district court jurisdiction over one of the severed cases, concurrent with appeals court jurisdiction over the other, could lead to a waste of resources in the event the cases involved a commonality of issues. *Powell,* 24 F.3d at 30–31; *see also United States v. Abrams,* 137 F.3d 704, 707 (2d Cir.1998).

The *Powell* rationale applies here. King's pleading guilty to a subset of charges in effect severed the indictment into two parts and made him ready for sentencing on the charges related to the Final Notice scheme. The government has acknowledged as much in its brief. *See* Appellee's Br. at 22 ("Although *Powell* turned in part on the fact that the count before this Court had been severed from the remaining counts, that difference provides no basis for distinguishing this case. Indeed, if the Court dismissed the current appeal for lack of jurisdiction, the district court could create jurisdiction in this Court simply by formally severing the counts on which appellant had pleaded guilty from the remaining counts."). Because the court imposed sentence on counts 24 through 42, King was entitled to appeal the sentence despite the pending charges. *See Powell,* 24 F.3d at 31 ("When sentence was imposed on the severed counts, [defendant] was entitled to appeal because there was nothing left to be done but to enforce the sentence."). A contrary holding, under which King would begin serving his sentence before obtaining the right to appeal it, would violate fundamental notions of due process. *See Abrams,* 137 F.3d at 707. The government responds that the district court could stay execution of the judgment if warranted under the circumstances. As execution of the sentence was not stayed here, however, that theoretical possibility is not relevant to our decision.

Two other circuits have held they lacked jurisdiction to hear an appeal on one charge of a multiple-count indictment while other charges were pending. *See United States v. Leichter,* 160 F.3d 33, 34 (1st Cir.1998); *United States v. Kaufmann,* 951 F.2d 793, 794 (7th Cir.1992). Those cases, however, presented distinguishable facts. In *Leichter,* the district court decided sua sponte to sever for trial one count of a more than 390–count indictment. The jury convicted on that count after a two-month trial, and the court sentenced the defendants accordingly. The government then dismissed all but 38 of the remaining counts of the indictment. The defendants appealed, and execution of the sentences was stayed pending the appellate court's judgment. Concluding that no severance creating two distinct cases had occurred, the court held it lacked jurisdiction to hear the appeal. *Leichter,* 160 F.3d at 36–37. Here, in contrast, indictment charges 24 through 42 were distinct from the remaining counts, and the counts were effectively severed by King's guilty plea. Thus, the two objectives emphasized by the *Leichter* court—preserving a trial judge's authority to sever a case in the interests of litigation management and providing notice to litigants when severance occurs, *see id.* at 36—were not implicated. King created a de facto severance of the case by pleading guilty to a subset of the charges, and accordingly had notice of the severance.

*Kaufmann,* similarly, has no bearing here. The jury in that case acquitted on two counts of a five-count indictment, convicted on one and hung on the remaining two. All counts related to money laundering or attempted money laundering. The appeals court held it lacked jurisdiction over the defendant's appeal of his conviction while retrial on the two "closely-related counts" was pending. *Kaufmann,* 951 F.2d at 795. The appeal before us, in

contrast, is based on wholly severable counts. Moreover, a later Seventh Circuit opinion by the same panel noted that its previous decision represented a novel approach to the jurisdiction issue, one not followed by other circuits. *See United States v. Kaufmann*, 985 F.2d 884, 891 (7th Cir.1993).

In sum, the court's interest in ensuring a defendant has the right to appeal a sentence when he begins serving it outweighs the government's concerns about piecemeal appellate review. *Powell* controls. Accordingly, we hold that jurisdiction over King's appeal under the final judgment rule is proper.

### B. Knowingness and Voluntariness of King's Plea

■■ Before accepting a guilty plea, the court must address the defendant in open court and ensure that he understands the consequences of his plea, including the nature of the charge to which he is admitting, the mandatory minimum applicable penalty, the maximum possible penalty and the forfeiture of his right to a jury trial. Fed.R.Crim.P. 11(c). This court reviews de novo the sufficiency of a trial court's Rule 11 colloquy with a defendant. *United States v. Smith*, 60 F.3d 595, 597 n. 1 (9th Cir.1995); *United States v. Alber*, 56 F.3d 1106, 1109 (9th Cir.1995). Any errors in a Rule 11 hearing are reversible unless shown to be harmless. *See* Fed.R.Crim.P. 11(h); *United States v. Odedo*, 154 F.3d 937, 940 (9th Cir.1998).

■■ To prove a charge under 18 U.S.C. § 1341 (mail fraud), the prosecution must prove the defendant created a plan to obtain money by making knowingly false, material statements with the intent to defraud and used or caused to be used the mails to further an essential part of the plan. *See* Ninth Cir. Model Crim. Jury Instructions § 8.101; *United States v. Sayakhom*, 186 F.3d 928, 941 (9th Cir. 1999) (essential elements of mail fraud are specific intent to defraud, a scheme to defraud and use of the mails to execute the scheme; intent may be inferred from the defendant's statements and conduct, including the use of half-truths or concealment of material facts).[2]

At the July 20, 1999 hearing, King stated in response to questions from the court that he had "discussed with the government what the government has to prove" for conviction, including all elements of the charged offenses. However, when questioned about his specific actions, he admitted only to being "guilty to these mail fraud counts for non-fulfillment of the prizes that these people were to receive under the National Directory Sweepstakes."[3] King went on to tell the court, "I'm not pleading guilty to any false statements because as far as I'm concerned there were no false statements. I'm pleading guilty to mail fraud for non-fulfillment of prizes." Nevertheless, the district court judge concluded, "[King] has admitted the misconduct which is charged in counts 24 through 42 of the indictment" and accepted his guilty plea. The prosecution attempted to bolster the record by filing a "Further Submission by Government in Support of Factual Basis for

---

2. King does not challenge the factual basis for his guilty plea regarding count 42, using a counterfeit postage meter stamp.

3. King claimed he intended to use the Final Notice scheme as a means of compiling a mailing list, and had a $10,000 fund that he planned to divvy up among all respondents. After distributing approximately $8,900 in this manner, he found himself short of funds and therefore decided to use the remaining $1,100 to pay personal expenses. Thus, he contended during the July 20, 1999 hearing that the extent of the activity forming the basis of his guilty plea was his failure to distribute the remaining $1,100 in prize money.

Guilty Pleas," but King's attorney objected to the supplementation, stating he believed the existing factual basis on the record was sufficient to accept the plea. The court agreed, rejecting the brief as unnecessary and concluding that King's plea had been "unconditional . . . and unequivocal."

 The record is clear that the court informed King of the nature of the charges against him, satisfying the requirements of Rule 11(c). The only question, then, is whether the court's acceptance of King's plea, despite his assertion that he made no false statements, violated Rule 11(f)'s requirement that the court "satisfy it[self] that there is a factual basis for the plea." Fed.R.Crim.P. 11(f). Under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), a trial court may accept a defendant's guilty plea in accordance with Rule 11(f), even when the defendant maintains his innocence, provided the defendant clearly expresses a desire to enter the plea and the record contains "strong evidence of actual guilt." *Id.* at 37, 91 S.Ct. 160. Sufficient evidence indicating guilt is adequate; the court need not convince itself of guilt beyond a reasonable doubt. *Alber*, 56 F.3d at 1110.

 The record contains enough evidence of the elements of 18 U.S.C. § 1341 to comply with the requirements of *Alford*. The "Final Notice" postcard contained a number of material falsehoods. The postcard's first line claims, "We have not been able to reach you by telephone[;] therefore we are sending you this last and Final Notice . . .," but no such phone call was ever made. Recipients were informed they had been "selected as a winner in the $10,000.00 Sweepstakes," when in fact no "selection" had occurred—the postcards were sent to the names and addresses of people on a pre-existing mailing list. The postcards stated the available prize was "up to $10,000.00 Cash," when in fact King testified that $10,000 was the *total* amount

of money available for distribution to those who responded. These material falsehoods on the "Final Notice" postcards qualify as knowingly false, material statements made with the intent to defraud. Thus, under *Alford*, King's guilty plea was properly accepted, despite his denial of guilt with respect to an element of 18 U.S.C. § 1341.

### C. Plea Withdrawal

 According to the Federal Rules, a defendant may withdraw a guilty plea at any time before imposition of sentence, so long as he is able to show a "fair and just reason" for doing so. Fed.R.Crim.P. 32(e). After sentence has been imposed, the plea may be set aside only on appeal or by motion under 28 U.S.C. § 2255. *Id.; United States v. Baker*, 790 F.2d 1437, 1438 (9th Cir.1986). This court reviews a district court's denial of a motion to withdraw a plea for abuse of discretion. *United States v. Nagra*, 147 F.3d 875, 880 (9th Cir.1998).

The parties dispute whether the imposition of sentence occurred on August 31 or September 14, 1999, given that King attempted to withdraw his plea at the commencement of the hearing on the latter date. If we accept the government's position, King was sentenced on August 31, and the district court lacked jurisdiction to entertain King's September 14 motion to withdraw his plea. Alternatively, if the sentence was not imposed until September 14, the district court should have evaluated King's motion for the existence of any "fair and just reason" for withdrawal. Fed. R.Crim.P. 32(e).

 As a preliminary matter, we note that sentencing technically occurred when orally pronounced in court, rather than on December 17, 1999, the date the court entered judgment in this case "nunc pro tunc the above sentencing dates." *See*

*United States v. Aguirre,* 214 F.3d 1122, 1125 (9th Cir.2000). Thus, we must resolve which of the "above sentencing dates"—August 31 or September 14—controls for the purpose of King's attempt to withdraw his plea.

At the August 31 hearing, the court heard arguments regarding sentencing and heard from King. It then imposed a sentence of 71 months and restitution of $302,000. The sentence included an enhancement, pursuant to U.S.S.G. § 2F1.1(b)(3)(B), based on King's violation of a prior administrative order. The parties disputed whether King had been served with a copy of that administrative order. The court concluded that the enhancement was justified based on the existing record, but told defense counsel, "[I]n the event . . . you're able to show the absence of any evidence in the administrative orders that they were served upon the defendant, you can apply for a modification of the sentence in accordance with that." The following day, King's attorney sent a letter to the court alleging his client had not been served with the administrative order. On September 9, King filed notice that he was appealing his conviction and sentence. At the September 14 hearing, the court decided not to amend the sentence, although it proposed scheduling another status conference to allow King to confer with his attorney about the advisability of withdrawing his July 20 plea. The record does not reflect that the proposed conference ever took place.

The record shows that all parties considered sentence to have been imposed on August 31. The district court left open the issue of notice regarding the administrative order, but specifically told King he should apply to *modify the existing sentence* if he could produce evidence he had not been served with the order. The September 1 letter from King's attorney began, "Yesterday, the Court sentenced my client, Norman King, to a 71–month term of incarceration based on a final offense level of 19." During the September 14 hearing King's counsel again referred to the sentencing as having occurred at the prior hearing. The parties seemed to agree the September 14 hearing involved the possibility of amending the existing sentence, not the imposition of sentence generally.

When King pled guilty on August 31, it appears he expected to receive a sentence more lenient than the one the district court would eventually impose. When he discovered his sentence would be 71 months in prison and restitution of $302,000, he attempted to withdraw the plea. King's statements during the September 14 hearing show plainly that he decided to withdraw his guilty plea only when he discerned the severity of the sentence he was to receive:

> THE DEFENDANT: . . . I respectfully request to withdraw my plea.
>
> THE COURT: Well, I think it's fair to say, Mr. King, that you are opening up a can of worms and I'm not sure you know what you're doing, and I think you're ill-advised to make decisions of this kind without the advice of counsel.
>
> THE DEFENDANT: Your Honor, I have no choice. I have children. I haven't got 10 years to spend in jail.

In a slightly different context, the Supreme Court has cautioned against allowing this sort of gamesmanship when applying Rule 32(e). *See United States v. Hyde,* 520 U.S. 670, 677, 117 S.Ct. 1630, 137 L.Ed.2d 935 (1997) (describing entry of a plea as a "grave and solemn act" rather than a "temporary and meaningless formality reversible at the defendant's whim" in the context of a motion to withdraw a plea after its acceptance but before the imposition of sentence (internal quotation marks omitted)).

In sum, we hold that sentencing occurred on August 31, and the district court accordingly lacked jurisdiction to evaluate King's request to withdraw his plea. This court, however, does have jurisdiction to review his request. We do not permit withdrawal of a guilty plea after sentencing "unless a 'manifest injustice' would result." *Nagra,* 147 F.3d at 880 (quoting *Baker,* 790 F.2d at 1438). Given the evidence indicating King hoped to withdraw his plea primarily because he was unhappy with his sentence, denial of his request creates no manifest injustice. Accordingly, his request is denied.

### D. Challenges to the Imposition of Sentence

King challenges his sentence on a number of grounds. We address each in turn.

#### 1. "Organizer or Leader" Enhancement

King contends the district court erred in imposing a four-level enhancement of his offense level for being the organizer or leader of a criminal enterprise. *See* U.S.S.G. § 3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the offense level] by 4 levels."). We review interpretation of the Sentencing Guidelines de novo, *United States v. Smith,* 175 F.3d 1147, 1148 (9th Cir.1999), but review application of the Guidelines to the facts for abuse of discretion, *Koon v. United States,* 518 U.S. 81, 91, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). We examine a factual finding that a defendant was an organizer or leader for clear error. *United States v. Avila,* 95 F.3d 887, 889 (9th Cir.1996). Organizer or leader status must be shown by a preponderance of the evidence. *Id.*

King claims the others working in his operation were innocent clerical workers and, therefore, do not qualify as "participants" under the Guidelines. He took the position at sentencing that all of his employees "were basically very young people who came in and did clerical work for [King] and did errands," and demonstrated no criminal culpability. The government did not dispute this characterization. According to note 1 of § 3B1.1 of the Sentencing Guidelines, "[a] 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense ... is not a participant." Thus, absent proof that King's employees were participants in the "Final Notice" scheme as defined in the Guidelines, enhancement based on the "five or more" prong of § 3B1.1(a) was improper.

King also argues he was the only person involved in the "Final Notice" scheme. Because the "otherwise extensive" prong of the Guideline requires at least one other criminally culpable participant, he reasons, the enhancement should not apply to his crime. *See* U.S.S.G. § 3B1.1, cmt. n.2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."); *United States v. Mares–Molina,* 913 F.2d 770, 773 (9th Cir.1990). The government counters that the Presentence Report, the findings of which the court adopted, could be read to include King's ex-wife as a criminally responsible participant in the "Final Notice" scheme.

The district court made no findings on either issue, erroneously concluding that the "otherwise extensive" clause permitted the enhancement even in the absence of other culpable participants. Therefore, we remand to the district court for further factfinding and a reconsideration of its decision to apply the enhancement in light of the preceding discussion.

### 2. Calculation of Loss

 King contends the district court's calculation of the total amount of loss as being in the range of $200,000 to $350,000 was unsubstantiated. We review estimates of loss for clear error. *United States v. Barnes*, 125 F.3d 1287, 1290 (9th Cir.1997).

King disputes the government's method of estimating the loss figure, and argues that the court's decision was clearly erroneous to the extent it relied on the government's figures in deriving its own estimate. The government responds that the estimate was based in large part on the amount proposed by King's counsel at sentencing;[4] thus, even if the court finds the estimate unreasonable, King has waived the right to appeal it.

The government based its loss estimate on several sources. It cited $426,824 worth of checks in small denominations deposited in King's Las Vegas bank accounts between July 1991 and April 1995, as well as the $272,999 received from "900 number" calls. King argues that many of the checks were in denominations that could not be attributed to the "Final Notice" scheme. Moreover, he contends the payments from the 900 numbers cannot be traced directly to the charged time period.

To determine the loss from the counterfeit postal meter stamp, prosecutors provided two estimates of the number of postcards shipped with counterfeit stamps. The first, based on an extrapolation of estimates of the number of postcards that fit in a postal tray, the average weight of each postcard and the number of trays King shipped by Federal Express to the United States, came to 1.7 million. The prosecution used records of the number of postcards King had printed in Canada to arrive at its second estimate, 1.79 million. Using the 1.7 million figure, the government estimated King had used his counterfeit stamps to cause a loss in excess of $302,000. King responds that the prosecution's records do not show the contents of his Federal Express shipments to the United States, and complains that the government never produced any Canadian printing records to defense counsel or to the court.

The Sentencing Guidelines provide a base offense level for fraud. Based on the amount of monetary loss the fraud caused, the level increases incrementally. U.S.S.G. § 2F1.1(a), (b)(1). "For the purposes of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.... The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." U.S.S.G. § 2F1.1, cmt. n.9; *see also United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir.1999).

Noting that the amount of societal harm caused by the scheme was impossible to calculate precisely, the court estimated the loss for enhancement purposes at between $200,000 and $350,000. Given the conflicting estimates presented to the court, the difficulty inherent in calculating loss caused by a mail fraud scheme and the liberality embodied in § 2F1.1 of the Guidelines, the court did not clearly err in determining the amount of loss and the attendant increase in offense level. Therefore, we affirm the portion of the sentence based on the court's calculation of the loss; we need not address the government's waiver argument.

---

4. King argued the true loss figure from the "Final Notice" scheme should be $1,100, the amount of the $10,000 fund he used to pay personal expenses. In the event the court rejected this contention, King recommended halving the $426,000 figure proposed by the government.

### 3. Enhancement for Violating an Administrative Order

 King challenges the enhancement for violation of an administrative order, claiming that even though his wife had been given notice of the Postal Service's order to "cease and desist from falsely representing directly or indirectly, in substance and effect, whether by affirmative statements, implications or omissions that ... Recipients of Respondents' post cards have won a prize which is more valuable than the required remittance," he had never received adequate notice of the order. He also claims the district court failed to specify what conduct was prohibited by the order. The district court's factual findings are reviewed for clear error. *Avila*, 95 F.3d at 889.

A 1992 Postal Service Decision specifically found King bound by the Order because he had actual notice of it. The decision lists James Toledano as King's attorney, and certified mail receipts demonstrate that Toledano received copies of the decision. King argues Toledano did not represent him in the administrative matter. However, he offers no information to contradict the records of the administrative proceeding other than his own unsworn assertions.

Based on the evidence that King had notice of the administrative decision, the district court's decision to apply the enhancement under U.S.S.G. § 2F1.1(b)(4)(C) was not clearly erroneous. We therefore affirm the application of the enhancement.

### 4. Criminal History Score

King argues he did not qualify for a sentencing enhancement for commission of a crime within two years of release or while on supervised release. U.S.S.G. § 4A1.1(d) & (e). He was released from custody on May 16, 1991, meaning that the enhancement should apply under § 4A1.1(d) or (e) if he were found to have engaged in a component of the mail fraud before May 16, 1993.

The indictment alleges that King began devising the fraudulent scheme "[b]eginning in or about July 1991." No factual basis in the record supports this date, however. King contends his first efforts to further the "Final Notice" scheme began in November 1993.

On remand, the district court is instructed to address this argument. If it does not find that a preponderance of evidence shows that King began his efforts in furtherance of the "Final Notice" scheme before May 16, 1993, it must not add the three-point enhancement described in U.S.S.G. § 4A1.1(d) and (e) in its recalculation of King's sentence.

### 5. Concurrent or Consecutive Sentences

 Under the Sentencing Guidelines, if an "undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense, the sentence for the instant offense shall be imposed to run concurrently to the undischarged term of imprisonment." U.S.S.G. § 5G1.3(b). Otherwise, the sentencing judge may impose the new sentence concurrently, partially concurrently or consecutively "to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(c).

King contends the district court should have made his sentence concurrent with the 51–month sentence he was already serving for bank and mail fraud charges after his conviction in the District of Nevada. That conviction involved King's attempt to defraud a Bank of America branch in Nevada by depositing checks drawn on Canadian bank accounts that he had already closed, then withdrawing the money from the Nevada accounts before

the bank discovered the deposits were invalid. *See United States v. King,* 200 F.3d 1207, 1211 (9th Cir.1999). Because he used the Nevada accounts to deposit some of the proceeds from the "Final Notice" scheme, King contends the offense relating to his prior conviction was "fully taken into account in the determination of the offense level for the instant offense," making § 5G1.3(b) applicable. This argument is meritless: the mere fact that the same Nevada accounts were involved in both convictions does not mean the prior conviction was at all taken into account in determining his offense level in this case.

■ Section 5G1.3(c), the provision affording sentencing courts the discretion to run a new sentence consecutively, concurrently or partially concurrently to a prior undischarged sentence in order to arrive at a reasonable punishment for the new offense, presents a closer question. The 1994 version of the Guidelines instructed courts to estimate a reasonable punishment by determining the hypothetical sentence if both charges had been contained in the same indictment and were therefore subject to U.S.S.G. § 5G1.2. Courts were then required to impose a sentence approximating this hypothetical penalty or state their reasons for failing to do so. *See United States v. Luna–Madellaga,* 133 F.3d 1293, 1295 (9th Cir.1998).

The Guidelines were amended in 1995. Instead of requiring courts to engage in a hypothetical exercise, the new version mandated consideration of the following factors:

> [T]he type and length of the prior undischarged sentence; the time served, and the time likely to be served before release, on the undischarged sentence; whether the undischarged sentence was imposed in state rather than federal court; and any other circumstances that are deemed relevant to the determina-

tion of an appropriate sentence for the instant offense.

*Id.* (citing U.S.S.G. § 5G1.3 cmt. n.3 (1995)).

King contends the 1994 Guidelines should apply because the conduct occurred prior to the effective date of the new version—November 1, 1995. Sentencing courts should use the version of the Guidelines in effect on the date of sentencing unless doing so would violate the ex post facto clause. U.S.S.G. § 1B1.1. "The ex post facto clause prohibits the retrospective imposition of punishment if it disadvantages the offender, such as when a sentencing provision has been increased between the time the offense is committed and the time of sentencing." *United States v. Guzman–Bruno,* 27 F.3d 420, 422 (9th Cir.1994).

■ The 1994 Guideline version of § 5G1.3(c) is more favorable to King than the 1995 Guideline version. *United States v. Chea,* 231 F.3d 531, 539–40 (9th Cir. 2000). Thus, the district court must apply the 1994 Guidelines on remand in determining whether and to what extent to run the new sentence concurrently to King's prior undischarged term of imprisonment. In doing so, it must either apply the methodology described in the Guideline commentary or provide a good reason for not doing so. *Id.* at 536; *United States v. Redman,* 35 F.3d 437, 441 (9th Cir.1994). If the court chooses the latter course, it must explain its decision on the record in a way that indicates it has considered the commentary methodology. *Id.*

### 6. Sentencing on the Counterfeit Postage Meter Stamp Charge

■ King challenges the portion of his sentence for the counterfeit postage meter stamp violation on two grounds. First, he claims the district court erred by applying

the wrong guideline for the charge. Guideline § 2B5.1 covers offenses involving "counterfeiting of United States currency and coins, food stamps, postage stamps, treasury bills, bearer bonds and other items that generally could be described as bearer obligations of the United States, *i.e.*, that are not made out to a specific payee." U.S.S.G. § 2B5.1 cmt. n.2. King argues that postage meter imprints, unlike physical stamps, *are* made out to a specific payee, in that they bear one meter user's authorization number and are therefore not transferable or redeemable for cash. Therefore, King contends, the Guideline for general fraud offenses, § 2F1.1, should have been applied.

Physical stamps and postage meter stamps are both bearer obligations of the United States. When presented with either form of postage (in the appropriate amount), the United States has an obligation to deliver the mail to which the postage is affixed to its designated destination. A counterfeiter of physical stamps and a counterfeiter of postage meter imprints both seek to obtain delivery of their mail through the postal service without paying for the service. The difference in form of the counterfeited device is of no import. We have found no authority supporting King's contention that alternative forms of postage should be treated differently in this context. We therefore reject the argument.

King also argues the court impermissibly added an enhancement for "more than minimal planning" when the relevant provision of the Guidelines, § 2B5.1, does not provide for such an enhancement. The government concedes the enhancement was erroneous. We therefore reverse this aspect of the sentence as well and instruct the district court to correct the error during resentencing.

### 7. *Amount of Restitution*

Reiterating his claims concerning the errors in the government's estimate of the amount of loss, King argues the $302,000 in restitution he was ordered to pay the United States Postal Service was excessive. He also contends the $47,000 he must already pay the Postal Service as part of his bank fraud conviction should be deducted from any order of restitution in this case. Moreover, King objects to the district court's failure to consider his inability to pay restitution.

 Restitution orders are reviewed de novo. *United States v. DeSalvo,* 41 F.3d 505, 511 (9th Cir.1994). The factual findings underlying these orders are reviewed for clear error. *United States v. Hughes Aircraft Co.,* 20 F.3d 974, 980 (9th Cir.1994).

For the reasons described above, the district court was justified in assigning a value of $302,000 to the amount of counterfeit postage King used. Thus, the estimate was not clearly erroneous.

 King's argument about the $47,000 paid to the Postal Service for undelivered mail is also unavailing. Apparently, his argument is as follows: he was convicted in Nevada for paying the Post Office $47,000 with a bad check. However, the Post Office failed to deliver the mail for which he was paying the $47,000. Thus, under a "no harm, no foul" theory, the $47,000 in restitution he owes the Post Office as part of his prior conviction should be deducted from any restitution imposed in this case. Though creative, this argument has no support in law. We therefore reject it.

 King was ordered to pay restitution under the Victim and Witness Protection Act, 18 U.S.C. § 3663. The Act requires courts to consider a defendant's financial resources, including needs and

earning ability, before imposing restitution. 18 U.S.C. § 3663(a)(1)(B)(i)(II). However, courts have broad discretion regarding the type and extent of evidence they will consider in making this determination. *United States v. Ramilo*, 986 F.2d 333, 335 (9th Cir.1993). Ability to pay is only one factor involved in setting the amount of restitution. *Id.* Ultimately, the standard is a fairly lenient one: "[A]t the time restitution is ordered the record must reflect some evidence the defendant may be able to pay restitution in the amount ordered in the future." *Id.* at 336; *see also `United States v. Jackson*, 982 F.2d 1279, 1284 (9th Cir.1992) ("[T]he Ninth Circuit does not require that the defendant be able to pay in order to justify a restitution award.").

 The evidence before the district court established that King has some college education and a background in accounting, as well as extensive business experience, which should allow him to obtain gainful employment upon his release from prison. Furthermore, the court took into account his relative ability to pay in deciding not to impose a fine in addition to the restitution amount. Accordingly, the record supports the amount of restitution as established by the district court, and we affirm that portion of the sentence.[5]

### 8. Apprendi *Claims*

After oral argument in this case, King filed a supplemental brief contending the district court violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), by imposing a sentence beyond the statutory maximum for mail fraud without proof beyond a reason-

able doubt of the facts relied on to justify the increased sentence. *See id.* at 2362–63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Because we are already vacating and remanding for resentencing, we need not address the *Apprendi* issues on appeal, and leave it to the district court to consider the effect of *Apprendi*, if any, on its resentencing decision.

### CONCLUSION

We have jurisdiction to hear this appeal. We hold that King's plea was knowingly and voluntarily given. Despite his protestations of innocence, the strong evidence of King's guilt on the record supports the court's decision to accept his plea. Thus, we affirm the conviction.

We vacate the sentence, however, and remand for resentencing. On remand, the court is instructed to determine whether the organizer or leader enhancement is appropriate under U.S.S.G. § 3B1.1, and whether the enhancement for commission of a crime within two years of release or while on probation was warranted under U.S.S.G. § 4A1.1(d) and (e). The court is also instructed to engage in the analysis described in the commentary accompanying § 5G1.3(c) of the 1994 Sentencing Guidelines to determine whether King's sentence should run consecutively, concurrently or partially concurrently with his prior undischarged sentence. Finally, when recalculating King's sentence, the court is instructed not to add an enhance-

---

**5.** In his reply brief, King argues that his case should be reassigned to a different judge on remand. He waived this argument by not including it in his opening brief. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

Moreover, the claim has no merit. Judge Walker has given no indication that he would have difficulty maintaining impartiality on remand, and preservation of the appearance of justice does not in any way require reassignment. *See United States v. Hanna*, 49 F.3d 572, 578 (9th Cir.1995).

ment for more than minimal planning in determining the appropriate sentence for the counterfeit stamp charge, pursuant to U.S.S.G. § 2B5.1.

Convictions AFFIRMED; sentence VACATED; REMANDED for resentencing.