

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-8-2007

# USA v. Lessner

Precedential or Non-Precedential: Precedential

Docket No. 06-1030

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Lessner" (2007). *2007 Decisions*. Paper 507.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/507

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-1030

_____

UNITED STATES OF AMERICA

v.

BARBARA LESSNER,
                              Appellant

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Crim. No. 05-cr-00225
District Judge:  The Honorable J. Curtis Joyner

_____

Argued:  May 21, 2007

_____

Before: BARRY, CHAGARES, and TASHIMA,[*] Circuit Judges

(Opinion Filed: August 8, 2007)
_____

Ian M. Comisky, Esq. (Argued)
Matthew D. Lee, Esq.
Blank Rome
130 North 18th Street
One Logan Square
Philadelphia, PA   19103

Counsel for Appellant

_____

[*] The Honorable A. Wallace Tashima, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

Nancy B. Winter, Esq. (Argued)
Suite 1250
Office of the United States Attorney
615 Chestnut Street
Philadelphia, PA   19106

Counsel for Appellee

––––––––––

OPINION OF THE COURT

––––––––––

BARRY, Circuit Judge

This appeal arises from a 51-month sentence and a $938,965.59 order of restitution imposed on appellant Barbara Lessner following her pleas of guilty to 21 counts of wire fraud, defense procurement fraud, and obstruction of justice.  For the reasons that follow, we will affirm.

## I.  Factual and Procedural Background

From 1995 until 2002, Lessner was a Procurement Contracting Officer, Team Leader, at the Defense Supply Center in Philadelphia ("DSCP").  The DSCP is one of several field offices of the Defense Logistics Agency ("DLA"), a federal agency whose mission is to procure supplies for the military.  As a "warranted" contracting officer with authority to sign contracts on behalf of the DLA, Lessner oversaw a team of nine buyers in a group responsible for awarding contracts of less than $100,000 for the purchase of biomedical and hospital equipment.

The DSCP's competitive bid process is highly regulated. Upon receiving a request for supplies, DSCP personnel solicit quotes from contractors and compare those quotes against pre-established prices in Federal Supply Schedule Price Lists and on

the Medical Electronic Catalog system ("ECAT").[1]  If the DSCP cannot obtain a quote lower than the price listed in the Federal Supply Schedule, it must use the Federal Supply Schedule contract.  Similarly, if all quotes exceed the price listed on ECAT, the DSCP must obtain the product from the ECAT distributor.  When the lowest bid has been identified, the warranted contracting officer will sign a contract and fax it to the winning distributor.

Authority to award DLA contracts is limited to warranted contracting officers, such as Lessner.  "Buyers" lack authority to sign contracts that commit government funds, but are otherwise fully engaged in the procurement process.  As the supervisor of nine buyers, Lessner personally received all requests for supplies and distributed them among her buyers.  The buyers then solicited bids by telephone, documented the quotes, and reported their findings to Lessner.  Lessner completed the process by reviewing the buyers' research and signing contracts.

In August 2001, at a bar in King of Prussia, Pennsylvania, Lessner met and struck up a conversation with another patron named Scott Watanyar.  Lessner told Watanyar about her job at the DSCP, and Watanyar told her that he worked for a small distributor of electronics equipment, Pamir Electronics Corporation ("Pamir"), which was owned by his mother.  Pamir did not manufacture any of the products it sold, and Watanyar had no previous experience with federal government contracts.  Nonetheless, he told Lessner, he would like the opportunity to do contract work for the Department of Defense.

That same month, Lessner told her team of buyers about Pamir.  She identified Watanyar as Pamir's point of contact and

---

[1]  A Federal Supply Schedule Price List is a contract between the government and a manufacturer or distributor establishing fixed prices for certain goods over a set time period, typically one year.  ECAT, by comparison, provides DSCP personnel with information about current market prices and discounts offered by manufacturers of medical products.

urged her buyers to use him.  None of the buyers had previously heard of Pamir.  They quickly noticed, however, that  Lessner was engaging in whispered conversations with someone from Pamir, perhaps Watanyar, and observed that she was unusually involved in and knowledgeable about the details of Pamir's transactions.

In September 2001, one of Lessner's buyers, "K.T.," noticed that Lessner had awarded contracts to Pamir even though it had not tendered the lowest bid and despite the fact that the products could have been obtained at a lower price if purchased directly from the manufacturers.  K.T. reported the Pamir contracts to DSCP supervisors and began to question Lessner as to why Pamir was being awarded the contracts.  Lessner, in response, stopped distributing work to K.T. for a period of time.  Meanwhile, she continued to award contracts to Pamir, forging K.T.'s signature on contract folders when, in fact, K.T. had done no work on those contracts.

On May 11, 2002, Special Agents from the Defense Criminal Investigative Service ("DCIS") obtained copies of all Pamir contracts from DSCP files.  Between August 2001 and April 17, 2002, Pamir was awarded 163 contracts having a total value of approximately $3.3 million.  DCIS investigators confirmed that contracts were consistently awarded to Pamir when it was not offering the lowest price.  A cost-impact analysis performed on 119 of the 163 contracts revealed that Pamir, with Lessner's approval, overcharged the government by $938,965.59.

The DCIS investigation revealed a pattern of contracts awarded to Pamir for products that Lessner knew or should have known were available at lower prices from the manufacturers.  Among those contracts were 33 contracts for products manufactured by Telectro-Mek, Inc., a regular distributor to the DSCP whose prices were significantly lower than those offered by Pamir; 35 contracts for a product manufactured by Brenner Metal Products Corporation that the DSCP could have obtained for less than half of Pamir's price; 16 contracts for products manufactured by Nonin Metal, Inc. that the DSCP could have

4

obtained at a lower price from Government Marketing International, Inc., Nonin's authorized distributor, who advertised its lower price on the Federal Supply Schedule Price List; 17 contracts for products manufactured by Allied Healthcare Products, Inc., whose lower price for eight of those contracts was featured on the Federal Supply Schedule Price List; and two contracts for products manufactured by Kendro Laboratory Products, Inc., a company historically willing to quote directly to the government at established, lower government prices. As a Procurement Contracting Officer, Lessner was knowledgeable about the Federal Supply Schedule Price List and was responsible for identifying a distributor's past pricing history. In at least one instance, when Brenner Metal's president phoned Lessner to point out that the DSCP could realize significant savings by ordering directly from Brenner Metal, Lessner reportedly stated, "You receive enough Government contracts, don't look over my shoulder."

In July 2002, Lessner's supervisor reviewed the Pamir files and confirmed that Lessner had awarded contracts to Pamir for products that she could have purchased at lower prices on ECAT. One such award came just days after that same supervisor had advised Lessner that the product in question was available through ECAT.

On August 16, 2002, agents from the DCIS and the FBI executed a warrant authorizing the seizure from Pamir's offices of documents and computer files relating to Department of Defense contracts. The search revealed that Lessner had, on several occasions, faxed documents to Watanyar describing the prices that Pamir's competitors were bidding for certain products. Some of the documents bore handwritten notes from Lessner to Watanyar specifying the price he should bid to receive a particular contract, or advising him to submit a lower bid. Lessner also sent Watanyar copies of the Federal Supply Schedule Price List, which showed the prices of competing suppliers.

Lessner's buyers subsequently reviewed DSCP files for Pamir contracts. They discovered that, while each of the Pamir

files appeared to bear the signature of the buyer who purportedly worked on the contract, Lessner had in fact forged the buyers' signatures on 64 of the 163 files. For several of the remaining 99 files, Lessner had simply presented the file to the buyer with Pamir's quote and instructed the buyer to designate Pamir as the winning bidder.

For each of the 163 Pamir contracts, funds were wired from a United States government account in Columbus, Ohio, to Pamir's bank account in Exton, Pennsylvania, via the Federal Reserve Bank's Federal Automated Clearing House in Atlanta, Georgia. Lessner was able to circumvent the more stringent procedures governing the award of contracts worth more than $100,000 by improperly awarding multiple contracts to Pamir on the same day for the same item. She also placed fraudulent justifications in some of the files to conceal the fact that the items in question could be obtained elsewhere at lower cost.

On August 16, 2002, the same day that agents conducted their search of Pamir's offices, DCIS Special Agents interviewed Lessner at work. They escorted her to her workstation, advised her that they were about to conduct a lawful and authorized search, and instructed her to remove only personal items from her work space. As she was gathering her personal effects, agents saw Lessner throw a current 2002 United States Government Appointment Book in the trash can. She also removed a stack of files from a locked file cabinet and placed them on her desk. The agents then escorted her off the DSCP compound.

As she was leaving, the agents saw Lessner place a call on her cell phone. When they returned to her workstation to conduct their search, they found two of Lessner's buyers at her desk. Although both buyers denied having received a call from Lessner asking them to remove items from her desk, one of the buyers, Cynthia Verderame, was not truthful. As it turned out, Lessner had in fact called Verderame and instructed her to remove a folder from Lessner's desk and destroy it, adding that "they are accusing me of doing something wrong." Verderame retrieved the folder as requested, handed it to a fellow employee,

and instructed that employee to place it in the trunk of Verderame's car. Later that evening, Verderame reviewed the folder, which contained copies of Lessner's emails, faxes, handwritten notes, and customer letters, and tore the contents into pieces. Verderame subsequently pled guilty to one count of destruction and removal of property to prevent seizure.

During the August 16, 2002 interview and in subsequent interviews, Lessner attempted to conceal the extent of her relationship with Watanyar. Initially, she denied having met Watanyar or knowing him in a personal capacity, and denied knowing how he came to do business with the DSCP. After agents escorted her from the DCIS compound, however, they discovered Watanyar's home address in the appointment book that Lessner had discarded. At a subsequent interview, Lessner again denied having met Watanyar or providing contract information to him. When agents then confronted her with documents they had recovered in their searches, she claimed to have met Watanyar once, but denied a personal relationship. During a November 2003 interview, Lessner admitted that she sent bid information to promote a woman-owned business, but again denied any personal relationship. When shown phone records evidencing nearly 200 calls between her and Watanyar, including calls to and from her home and personal cell phone, she admitted a personal friendship, but denied any romantic involvement. Agents independently learned that Lessner and Watanyar had gone out socially on several occasions.

On April 19, 2005, a federal grand jury returned a 21-count indictment charging Lessner with ten counts of wire fraud, in violation of 18 U.S.C. § 1343; eight counts of defense procurement fraud, in violation of 41 U.S.C. § 423(a) and (e); two counts of destruction of records in a federal investigation, in violation of 18 U.S.C. § 1519; and one count of destruction and removal of property to prevent seizure, in violation of 18 U.S.C. § 2232(a). On September 21, 2005, Lessner pled guilty to all counts.

Defense counsel thereafter moved for a downward departure under U.S.S.G. § 5K2.13 based on Lessner's

diminished capacity. At the December 14, 2005 hearing on the motion, Lessner proffered expert testimony that she suffered from major depressive disorder at the time of the offenses. She also cited anxiety resulting from her husband's heart attack and the September 11th terrorist attacks. The government, through its own expert witness, conceded that Lessner suffered from present depression as a result of the criminal proceedings, but maintained that she did not exhibit any symptoms of mental illness at the time of her offenses which, we note, were well underway both before the heart attack and September 11th. The District Court also heard testimony from a DCIS Special Agent and several of Lessner's co-workers. It subsequently denied the motion.

At the December 19, 2005 sentencing hearing, the District Court found, as had the Presentence Report ("PSR"), that Lessner's total offense level was 24, which included a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. The Court denied Lessner's request for a reduction in the offense level for acceptance of responsibility under U.S.S.G. § 3E1.1, finding that her case was not among the class of "extraordinary cases" in which adjustments under both §§ 3C1.1 and 3E1.1 may apply. Finding a criminal history category of I, and noting the advisory Guidelines range of 51 to 63 months, the Court imposed a bottom-of-the-range sentence of 51 months' incarceration, followed by three years of supervised release. The Court also ordered mandatory restitution of $938,965.59 and a mandatory special assessment of $2,100. This appeal followed.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1) and (2).

## II. Discussion

Lessner raises numerous issues on appeal, four of which were not raised before the District Court. We will discuss each of the issues in turn.

**A.    Whether the District Court Committed Plain Error When it Accepted Lessner's Guilty Plea**

Lessner argues that the District Court should not have accepted her guilty plea before questioning her on her statements to the Court that she was under the care of mental health professionals and taking "10 pills a day." (J.A. at 50.) Because no contemporaneous objection was raised, we review the adequacy of the plea colloquy for plain error. Fed R. Crim. P. 52(b); *United States v. Vonn*, 535 U.S. 55, 58-59 (2002).

Plain error exists only when (1) an error was committed (2) that was plain, and (3) that affected the defendant's substantial rights. *United States v. Stevens*, 223 F.3d 239, 242 (3d Cir. 2000). Even then, the decision to correct the error is discretionary. *United States v. Campbell*, 295 F.3d 398, 404 (3d Cir. 2002). A court of appeals should exercise its discretion "only if the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Stevens*, 223 F.3d at 242 (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

By entering a plea of guilty, a criminal defendant waives his or her constitutional rights to be tried by a jury, to confront his or her accusers, and to exercise the privilege against self-incrimination. *Parke v. Raley*, 506 U.S. 20, 29 (1992). Like all waivers of constitutional rights, a guilty plea must be made "voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). A district court commits reversible error by accepting a defendant's guilty plea without creating a record to show that the plea was knowing and voluntary. *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969).

Rule 11 of the Federal Rules of Criminal Procedure sets forth the standards governing the acceptance of guilty pleas. It does not, in itself, embody a constitutional directive. *See United States v. Timmreck*, 441 U.S. 780, 783-84 (1979) (noting that a violation of Rule 11 "is neither constitutional nor

9

jurisdictional"). Rather, "it is designed to assist the district judge in making the constitutionally required determination that a defendant's guilty plea is truly voluntary," and in producing "a complete record at the time the plea is entered of the factors relevant to this voluntariness determination." *McCarthy v. United States*, 394 U.S. 459, 465 (1969). A district court may not accept a plea of guilty without first personally addressing the defendant, under oath and in open court, and ascertaining that the plea is voluntary. Fed. R. Crim. P. 11(b)(1), (2). The court must also ascertain that the defendant understands the rights that he or she is waiving by pleading guilty, and that there is a factual basis for the plea. Fed. R. Crim. P. 11(b)(1), (3). Even if a court deviates from these requirements, the error is harmless if it does not affect substantial rights. Fed. R. Crim. P. 11(h).

At the change-of-plea hearing, defense counsel advised the District Court that his client was presently seeing three mental-health professionals. In response to the Court's questioning, Lessner testified that she was seeing "Dr. Glass once a week; Miriam Adler twice a week and Dr. Pierce once every two weeks." (J.A. at 49.) The Court then inquired whether Lessner was taking any medication, prompting the following exchange:

A. 10 pills a day.

Q. And what type of pills are they?

A. I'm taking Lexapro, Buspar, Ativan, Ambien and Lorazepam.

Q. And did you take any of these medications this morning?

A. I took two.

Q. What two did you take?

A. Ativan.

Q. Two Ativan. And what if any - - well let me ask you this way. Does the taking of this medication affect your ability to understand and appreciate what is taking place in this courtroom this morning?

A. It just puts me in perspective, I understand.

Q. When you say, "Puts you in perspective" - -

10

> A. Calms me down.
>
> Q. So that you can deal with the circumstances?
>
> A. Yes, your honor.
>
> Q. Very well. Are you presently under the influence of any drugs or medication or alcoholic beverage of any kind other than the two that you have indicated that you have taken this morning?
>
> A. No, sir.

(*Id.* at 50.) The standard Rule 11 plea colloquy followed, at the conclusion of which the Court found that Lessner was "fully competent and capable of entering an informed plea" and that her guilty plea was "a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense." (*Id.* at 64.)

Lessner argues that the District Court "made only a limited and superficial inquiry" into the medications that she was taking while failing to ascertain their dosages or whether she had taken any of them "the prior day, week or month." (Lessner's Br. 29.) She urges us to take judicial notice of the "significance" and "possible effects" of her medications (*id.* n.7), and contends that the Court accepted a non-responsive answer when it inquired whether she could understand and appreciate the proceedings. The government maintains that the Court's questioning was sufficient to establish the knowing, intelligent, and voluntary nature of the guilty plea.

Having carefully reviewed the transcript of the plea colloquy, we conclude that the District Court developed an adequate record to satisfy not only the procedural requirements of Rule 11, but also the constitutional requirement that a guilty plea be knowing, voluntary, and intelligent. The Court inquired into the medications that Lessner was taking and those she had taken that morning. It asked whether the medications she had taken that morning affected her ability to understand the proceedings, and posed several follow-up questions to elicit further information. It also inquired whether Lessner was

11

presently under the influence of any other medications or controlled substances. We are satisfied that Lessner's answers to those questions were responsive. We are likewise satisfied, as was the Court, that Lessner's conduct and demeanor throughout the change-of-plea hearing amply demonstrated the voluntariness of her plea.

The cases on which Lessner relies to the contrary are unavailing. In *United States v. Cole*, 813 F.2d 43 (3d Cir. 1987), the defendant testified at his change-of-plea hearing that he "had some drugs last night," but the District Court, seemingly unfazed by this revelation, inquired only whether the defendant understood what the Court had said. *Id.* at 45; *see also id.* at 46 (finding the record ambiguous as to whether the district court even noted the defendant's admission of recent drug use). Had the Court specifically inquired into the defendant's drug use, it would have learned that the defendant had ingested $400 of heroin and $250 of cocaine between 5:00 P.M. the previous evening and 6:00 A.M. that morning. *Id.* at 44. Under such circumstances, we held, the Court owed a duty of further inquiry, and the absence of such inquiry precluded a finding that the defendant's guilty plea was knowing and voluntary. *Id.* at 46, 47. Here, however, the Court did inquire into the medications that Lessner had taken on the day of the change-of-plea hearing, as well as their effect on her ability to understand the proceedings. Where a district court has made such an inquiry, the sufficiency of which is later contested, *Cole* provides little guidance.

Lessner also cites the Court of Appeals for the First Circuit's decision in *United States v. Parra-Ibanez*, 936 F.2d 588 (1st Cir. 1991), an opinion purporting to follow *Cole*. In *Parra-Ibanez*, a defendant with a known history of drug use, depression, and attempted suicide advised the Court at the change-of-plea hearing that he had taken Ativan, Halcion, and Restoril within the past 24 hours. The Court then asked, "Ativan, is that a drug to control your nerves or something?", and the defendant responded, "Yes, sir." No further inquiry was made into the defendant's medication; the Court merely asked whether the defendant understood the proceedings and the

12

maximum penalty that he faced, and whether counsel were satisfied that the defendant was competent to plead guilty. The Court of Appeals held that

> the judge did not inquire what dosages of Ativan, Halcion and Restoril Parra had ingested and what effects, if any, such medications might be likely to have on Parra's clear-headedness. The judge, though plainly making a substantial inquiry, did not probe deeply enough. We join the Third Circuit [in *Cole*], and hold that the judge was obligated by Rule 11 to ask further questions.

*Id.* at 596 (footnote omitted). In a footnote, the Court observed that "the obligation of further inquiry was enhanced by Parra's recital in [a] prior hearing of a history of drug use, depression and attempted suicide." *Id.* n.16. Concluding that Rule 11 had been violated, the Court reversed and remanded for findings on whether the error was harmless.

*Parra-Ibanez* is distinguishable both as to the severity of the defendant's history of mental illness and the brevity of the Court's inquiry. There, just one week before the change-of-plea hearing, the Court held a competency hearing at which the defendant testified to his drug use, depression, and attempted suicide—factors that enhanced the Court's duty of inquiry under Rule 11. Yet at the change-of-plea hearing, the Court made only passing inquiry into the purpose of just one of the three prescription medications that the defendant admitted to having taken in the previous 24 hours, while failing to inquire whether any of the medications impaired the defendant's ability to understand the implications of his guilty plea.

Here, by comparison, Lessner advised the District Court that she began seeking counseling for "mental illness" only after she committed the offenses, and did not report any history of more serious conditions, such as drug abuse or attempted

suicide.[2]  (J.A. at 48.)  *See United States v. Stewart*, 977 F.2d 81, 84 (3d Cir. 1992) (distinguishing *Cole* "where nothing about drug abuse was brought to the attention of the trial judge").  The Court ascertained that she was only under the influence of two Ativans at the time of the hearing, and that that medication did not impair her ability to understand the proceedings.[3]  *See United*

---

[2]  Lessner faults the District Court for failing to make a finding of competency prior to the change-of-plea hearing.  To the extent she suggests that she was not legally competent to plead guilty, we reject that argument.  She did not so argue before the District Court, and the record plainly shows her counsel agreeing "[a]bsolutely" with the Court's finding that she was competent to plead guilty.  (J.A. at 66; *see also* J.A. at 64.)  *See United States v. Jones*, 336 F.3d 245, 256 (3d Cir. 2003) (noting that "an attorney's representation about his client's competency" may be relevant to a court's evaluation of a defendant's competency (internal quotation marks omitted)); *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986) (noting that deference is owed to a district court's competency determination based on observations during court proceedings).  It is also significant that when Lessner was later evaluated for diminished capacity, no mental health expert found an impairment of her cognitive functions even approaching the stringent standard for legal incompetence.  *See* 18 U.S.C. § 4241(a) (requiring that the defendant be "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense").  (*Cf.* J.A. at 94 (finding Lessner's thinking "organized and goal-directed," with no evidence of delusions or hallucinations, an "intact" memory, and an ability to concentrate); *id.* at 116 (opining that Lessner "does not suffer from reduced mental capacity" and "has no impaired ability to understand the wrongfulness of her behavior . . . nor to exercise the power of reasoning"); *id.* at 120-21 (finding no evidence of hallucinations or delusions, "okay" cognitive functions, and "adequate" memory).)

[3]  Lessner, arguing that she gave a "hopelessly ambiguous" response to the Court's query whether the medication affected her ability to understand the proceedings (Reply Br. 4), would have us ignore that portion of her response in which she affirmed, "I

*States v. Morrisette*, 429 F.3d 318, 322 (1st Cir. 2005) (distinguishing *Parra-Ibanez* on the ground that the District Court in that case failed to make any inquiry into whether the medication affected the defendant's ability to comprehend); *United States v. Savinon-Acosta*, 232 F.3d 265, 268 (1st Cir. 2000) ("The critical question is whether the drugs—if they have a capacity to impair the defendant's ability to plead—have in fact done so on this occasion."). Lessner clearly demonstrated her understanding of the proceedings throughout the hearing, to the satisfaction of both the Court and defense counsel. (*See* J.A. at 64, 66.) We find, therefore, that the Court sufficiently discharged its duty under Rule 11 to inquire into Lessner's capacity to enter a knowing and voluntary plea and, in fact, found that she did just that.

**B.      Whether the District Court Committed Plain Error by Finding an Adequate Factual Basis for Lessner's Pleas of Guilty to the Obstruction Charges**

Lessner argues, next, that the District Court erred in accepting her guilty pleas to the obstruction charges because there was not an adequate factual basis for the pleas. As she did not raise this argument before the District Court, we review for plain error.

Lessner pled guilty to counts 19 and 20 of the indictment, charging her with obstruction of justice in violation of 18 U.S.C. § 1519, the so-called anti-shredding provision of the Sarbanes-Oxley Act of 2002. The plain language of the statute requires the defendant to have destroyed evidence "knowingly" and with the "intent" to impede an investigation or case.[4] *See United*

---

understand" (J.A. at 50).

> [4] Section 1519 provides as follows:
> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter

*States v. Wortman*, ___ F.3d ___, 2007 WL 1651088, at *3 (7th Cir. June 8, 2007). Count 19 related to Lessner's disposal of the appointment book containing Watanyar's home address.[5] Count 20, which also charged aiding and abetting under 18 U.S.C. § 2, related to Lessner's cell phone call to Verderame.

At the Rule 11 hearing, after reciting the elements of § 1519, the District Court questioned Lessner as follows:

> Q. My next question would normally be and is at this particular point in time, did you commit these offenses, these two counts, counts 19 and 20?
>
> A. Yes.
>
> Q. Now, I hear encouragement from the back, I don't know if that is your mother or your

---

within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519.

[5] Lessner argues that her disposal of the appointment book in the presence of DCIS Special Agents precluded a finding that she "destroy[ed], mutilate[d], conceal[ed], [or] cover[ed] up" a document or tangible record. Given Congress's intent that § 1519 apply broadly, *see* 148 Cong. Rec. S7419 (daily ed. July 26, 2002) (statement of Sen. Leahy), Lessner's act of disposal—which seems clearly to be a form of "destruction"—falls within the proscriptions of the statute. *See* Dana E. Hill, Note, *Anticipatory Obstruction of Justice: Pre-Emptive Document Destruction under the Sarbanes-Oxley Anti-Shredding Statute, 18 U.S.C. § 1519*, 89 Cornell L. Rev. 1519, 1559-60 (2004). Moreover, the pertinent "record"—Watanyar's contact information—was not visible to the agents, and Lessner may not have suspected that they would retrieve the appointment book and discover the record. Viewed in this light, the disposal of the appointment book was also an attempt to "conceal" and "cover up" a "record."

16

> sister or some relative or friend, whatever the case may be, I want your response, not theirs.
>
> A.  In my day planner, I had everybody's number and address in there. When I was being walked out, I just threw it in the trash because I knew I was not coming back. I didn't realize that his [Watanyar's] number was in there either.
>
> Q.  My question to you, ma'am, is did you commit this offense.
>
> A.  I put it in the trash can.

(J.A. at 59-60.) The Court subsequently asked whether Lessner and her counsel had reviewed the government plea memorandum. Defense counsel responded that he reviewed the memorandum with his client, and that "[e]verything there is correct." (*Id.* at 63.) The Court then asked Lessner whether "you likewise will stipulate to facts that are contained in the guilty plea memorandum that is stated by the government as to what they would be prepared to prove against you if this matter were to proceed to trial," and Lessner responded, "Yes, sir." (*Id.*) She then entered her pleas of guilty.

Lessner argues, with regard to count 19, that her express disclaimer of a critical element of the crime precluded the District Court from accepting her guilty plea. Rule 11(b)(3) requires a district court, before entering judgment on a guilty plea, to "determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). A district court need not, however, be convinced beyond a reasonable doubt of a defendant's guilt to accept a plea of guilty; it need only find sufficient evidence in the record as a whole to justify a conclusion of guilt. *United States v. Cefaratti*, 221 F.3d 502, 509-10 (3d Cir. 2000). *See generally North Carolina v. Alford*, 400 U.S. 25, 37-38 (1970) (permitting court to accept defendant's guilty plea over protestations of innocence). "The court may make that inquiry by looking to the defendant's own admissions, the government's proffer of evidence, the presentence report, or 'whatever means is appropriate in a specific case – so long as the factual basis is

17

put on the record.'" *Cefaratti*, 221 F.3d at 509 (quoting *United States v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998)); *see also United States v. Trott*, 779 F.2d 912, 914 n.1 (3d Cir. 1985) ("Indeed, an otherwise valid guilty plea may be properly accepted even if the defendant during the colloquy denies factual guilt, so long as a factual basis is adequately provided by other sources."). Thus, there is no violation of Rule 11 where a district court finds a factual basis for the guilty plea from the evidence in the record, notwithstanding the defendant's protestation of factual innocence. *See United States v. King*, 257 F.3d 1013, 1022 (9th Cir. 2001) (finding no violation of Rule 11 under such circumstances).

There was more than sufficient evidence of Lessner's guilt to permit the District Court to accept her guilty plea to count 19 even were we to assume that she disavowed an intent to impede the DCIS investigation. Lessner stipulated that DCIS Special Agents advised her she was under investigation and was to remove only personal items from her desk. She falsely denied knowing Watanyar while contemporaneously discarding the appointment book containing his home address. Although she also denied knowing that Watanyar's information was in the book, she had no trouble recalling that "everybody's number and address [was] in there." (J.A. at 59.) From the record before it, the Court could and did find a factual basis for the plea. (*Id.* at 64 (expressly finding "an independent basis in fact containing each of the essential elements of the offense").) Lessner's Rule 11 challenge to her guilty plea on count 19, accordingly, fails.

Lessner's challenge to the District Court's acceptance of her guilty plea to count 20 also fails. Lessner entered a guilty plea to count 20, but asserted that she "didn't ask anyone to destroy[] anything." (J.A. at 60.) Even if that assertion were correct (which, according to Verderame, it was not), it did not constitute a disavowal of an essential element of the crime. Lessner's admission to calling Verderame and asking her to remove a folder from her desk, even if not to destroy the folder, was an admission to knowingly "conceal[ing]" documents. 18 U.S.C. § 1519. This admission, coupled with Lessner's stipulation to the facts contained in the guilty plea memorandum

and other facts of record, provided an adequate factual basis to justify the Court's acceptance of her guilty plea to count 20.

Lessner also challenges the factual basis of her guilty plea to count 21, charging her with destruction or removal of property to prevent seizure in violation of 18 U.S.C. §§ 2232(a) and 2.[6] As does count 20, count 21 relates to Lessner's cell phone call to Verderame that resulted in the removal and destruction of the folder from Lessner's desk. Conviction under § 2232(a) requires the intent to prevent seizure, *Gasho v. United States*, 39 F.3d 1420, 1430 (9th Cir. 1994), and Lessner contends that there was neither a search warrant nor circumstances providing her with notice that the folder in question was subject to imminent seizure.

There is ample evidence in the record that when Lessner asked Verderame to remove the folder from her desk, she knew that it could and probably would be immediately seized. Again, she stipulated that DCIS Special Agents informed her that they were about to perform what she concedes was a lawful and authorized search, and that she was to remove only personal items from her workstation. She further stipulated to removing a stack of Pamir files from a locked filing cabinet and placing them on her desk before being escorted off the DSCP compound,

---

[6] Section 2232(a) provides as follows:
Whoever, before, during, or after any search for or seizure of property by any person authorized to make such search or seizure, knowingly destroys, damages, wastes, disposes of, transfers, or otherwise takes any action, or knowingly attempts to destroy, damage, waste, dispose of, transfer, or otherwise take any action, for the purpose of preventing or impairing the Government's lawful authority to take such property into its custody or control or to continue holding such property under its lawful custody and control, shall be fined under this title or imprisoned not more than 5 years, or both.
18 U.S.C. §2232(a).

an act fully consistent with the expectation of an imminent search or seizure. She then called Verderame and asked her to remove a folder from her desk, supplying context to this request by adding that "they are accusing me of doing something wrong." Acting at Lessner's behest, Verderame removed the folder, lied to investigators about doing so, and destroyed it later that evening. There was a sufficient factual basis for Lessner's guilty plea to count 21.

**C.      Whether the District Court Erred by Failing to Grant a Reduction in the Offense Level for Acceptance of Responsibility**

The District Court, following the recommendation of the PSR, applied a two-level upward adjustment, pursuant to U.S.S.G. § 3C1.1 (2001), for the obstruction of justice charged in counts 19 through 21. Lessner does not contest this adjustment. The Court denied, however, Lessner's request for a three-level reduction in the offense level for acceptance of responsibility under U.S.S.G. § 3E1.1. Lessner contests this denial. We review factual findings underlying the denial of a Sentencing Guidelines reduction for acceptance of responsibility for clear error, and reverse only if we are left with a definite and firm conviction that a mistake has been committed. *United States v. Boone*, 279 F.3d 163, 193 (3d Cir. 2002); *United States v. Felton*, 55 F.3d 861, 864 (3d Cir. 1995).

Section 3E1.1(a) of the 2001 Guidelines provides that a district court may grant a two-level reduction in the offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense"; an additional one-level reduction is available under subsection (b) if certain conditions are met. The § 3E1.1(a) reduction contemplates a defendant "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct)." U.S.S.G. §3E1.1 cmt. n.1(a). "[A] defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." *Id.*

Entry of a guilty plea will constitute "significant evidence" of acceptance of responsibility, although it will not entitle the defendant to an adjustment "as a matter of right." *Id.* cmt. n.3; *see also United States v. McDowell*, 888 F.2d 285, 292 n.2 (3d Cir. 1989) (stating that sentencing court must consider "the totality of the situation" when determining acceptance of responsibility). Of significance here, "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." § 3E1.1 cmt. n.4. The sentencing court's findings in this regard flow from its "unique position to evaluate a defendant's acceptance of responsibility" and are "entitled to great deference on review." *Id.* cmt. n.5.

At the December 19, 2005 sentencing hearing, following extensive testimony and argument, the District Court denied the § 3E1.1 adjustment, finding that Lessner had failed to demonstrate the existence of an "extraordinary case" warranting adjustments under both §§ 3C1.1 and 3E1.1. (J.A. at 491.) Lessner contends that this was error. Citing pre-*Booker* cases from the Courts of Appeals for the Sixth and Ninth Circuits, she posits that when the obstruction is limited to the very early stages of a criminal proceeding, and a defendant subsequently accepts responsibility, the case is "extraordinary" within the meaning of application note 4. *See United States v. Gregory*, 315 F.3d 637 (6th Cir. 2003); *United States v. Hopper*, 27 F.3d 378 (9th Cir. 1994).

One, albeit important, flaw in Lessner's argument is that her obstructive conduct continued well beyond her actions on August 16, 2002. Two weeks after asking Verderame to remove the folder from her desk, Lessner called Verderame to confirm that she had done so. There is also evidence that as late as November 2003, Lessner continued to mislead investigators about the extent of her relationship with Watanyar. Moreover, she made no efforts to inform authorities of the nature of the information contained in the folder that Verderame destroyed,

21

and concealed key information from her own mental health expert.

But apart from whether and how long her obstructive conduct continued, even at sentencing Lessner admitted, at most, to having made a mistake and failed to demonstrate much if any acceptance of personal responsibility for her actions.

THE WITNESS: . . . I thought it was going to be something good I would be doing. I didn't think it was a criminal act. Believe me, I never did anything wrong in my whole life, and I never intended to do anything to myself or hurt anybody like these girls.

THE COURT: Why would you tell your friend to destroy the documents if you didn't know it was a criminal offense?

THE WITNESS: They told me I was going to be – the industries were blind, and it was the agent. I was devastated. I went into shock when she showed me the badge. I didn't think it was a criminal act. I did not. If I did, I would have resigned and left, believe me. I'm not a bad person.

(J.A. at 482.) When the Court pointed out that Lessner made "[a] number of mistakes, a number of contracts," she deflected blame by portraying herself as a victim of circumstances, even though those circumstances arose only after she began her fraudulent activities.

THE WITNESS: I was under stress. We had 9-11. I was trying to get the

work out. I was not thinking clear. I was not thinking clear, believe me. If I was, I wouldn't be sitting here before you, sir. I would not be sitting here before you if I was thinking clear and putting myself through this at a perfect time of my life. I didn't mean to hurt anybody. I didn't think it was a criminal act, believe me. I wouldn't do something like this. I wouldn't do it. . . .

(*Id.* at 483-84.) "[Y]ou have an explanation for everything that comes down," the Court responded, "[b]ut it still doesn't justify or explain away your criminal conduct." (*Id.* at 486). Lessner continued—and repeatedly continued—to refer to her conduct as "a mistake" while refusing to admit that she harmed anyone other than herself.

THE WITNESS: . . . I didn't kill anybody or hurt anybody. I hurt myself. I hurt myself. I didn't want to hurt anyone else, believe me. I wouldn't have done that. I wouldn't have done that. I don't want to ever – I'm not the kind of person that hurts somebody. I always try to do the best for somebody, and this just destroyed my life. It has destroyed my life, believe me. It's destroyed – I live through a peep hole. I don't even want to go out of the house. I don't want to do anything. . . .

THE COURT: Ms. Lessner, why didn't you

23

think about that before you committed these offenses?

THE WITNESS: I did not think it was a criminal act. Believe me, believe me. I know it is. I know it was. I was just rushing. I was under stress. I was worried about him. When he got sick, my whole life was ruined.

THE COURT: Why is it that when you were rushing and under stress, it only related to this one person, this one contractor, this one person that was –

THE WITNESS: We had so much work at our office at that time. He was sending confirmations that the items were shipped and was making my job a little easier. I did not think I was doing something wrong. I was getting confirmations. You know, that's all. I didn't mean to hurt anyone. I didn't. I would never want to go through this again. Please forgive me. Please, please forgive me. I beg of you. I beg of you. Please, please.

(*Id*. at 487-89; *cf. id*. at 333 (describing harm to Lessner's staff).) The Court also noted Lessner's apparent lack of contrition at sentencing. (*Id*. at 495-96).

Lessner's ongoing denial of conduct for which the District Court previously found a factual basis, and her invocation of the September 11th attacks and her husband's December 2001 heart attack as justification for fraudulent acts that began in August 2001, are "inconsistent with acceptance of

responsibility." *See* U.S.S.G. § 3E1.1 cmt. n.1(a). According "great deference" to the Court's finding that this is not an "extraordinary case," *id.* cmt. nn.4, 5, it is absolutely clear that no error was made.

**D.     Whether the Restitution Order Was Improper for Lack of Findings**

The District Court ordered restitution of $938,965.59, with $234,741.39 due within six months of the imposition of sentence, another $234.741.39 due within twelve months of the imposition of sentence, and the balance due in $500 monthly installments upon Lessner's release from custody. Noting the PSR's observation that she lacked the ability to also pay a fine, Lessner argues that the Court erred by failing to explore her financial circumstances on the record before ordering restitution. Although she suggests that she raised this issue in her "[p]leas for consideration of § 3553(a) factors" (Lessner's Br. 3), the record shows no contemporaneous objection to any failure to make findings (*see* J.A. at 493-500). We, therefore, review for plain error. *United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001).

Under 18 U.S.C. § 3663A, full restitution is mandatory when an identifiable victim has suffered pecuniary loss and the defendant is convicted of "an offense against property" under Title 18, including "an offense committed by fraud or deceit." 18 U.S.C. § 3663A(a)(1), (c)(1); *see also* U.S.S.G. § 5E1.1(a)(1). Where there has been an award of full restitution, § 3664(f)(2) requires the sentencing court to "specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid," with reference to "the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled"; "projected earnings and other income of the defendant"; and "any financial obligations of the defendant[,] including obligations to dependents." 18 U.S.C. § 3664(f)(2). We have held that a district court commits plain error when, having ordered full restitution, it fails to state on the record the manner and schedule of payments after taking into account the

defendant's financial resources. *United States v. Coates*, 178 F.3d 681, 684 (3d Cir. 1999). The district court's obligation to comply with § 3664(f)(2) may not be delegated to the probation office. *Id.* at 684-85.

Here, unlike *Coates*, the District Court specified a payment schedule in its restitution order:

> [Y]ou shall pay a lump sum payment of at least $234,741.30 within six months of the date of the imposition of the sentence, and another lump sum payment of at least [$]234,741.39 within 12 months of the imposition of this sentence. After you're released from custody, you are to pay the remaining restitution in monthly installments of $500 to the United States Defense Logistics Agency.

(J.A. at 494.) The Court did not, however, explicitly state on the record that it had considered Lessner's financial situation. We must decide whether this omission constitutes plain error.

The plain error that we found in *Coates* was at least as much a consequence of the District Court's failure to specify a payment schedule as it was of the Court's failure to state that it had considered the defendant's financial situation. *Coates*, 178 F.3d at 685 (holding that the district court committed plain error by failing to satisfy the requirements under § 3664(f)(2) and implicitly delegating responsibility to fix restitution payments to the probation office). In *Coates*, we noted that when ordering full restitution, "the district court is required to consider the financial resources, projected earnings, and financial obligations of the defendant." 178 F.3d at 683. We did *not* expressly hold, however, that a district court must do so on the record, and we do not so hold now. Rather, we hold that where, as here, the record evidences a court's consideration of the defendant's financial situation—albeit without express findings—the requirements of § 3664(f)(2) are satisfied. *See United States v. Jones*, 289 F.3d 1260, 1265-66 (11th Cir. 2002) (holding same). (*See also* App. at 494 (ordering lump-sum restitution payments

26

totaling exactly 60% of the PSR's unchallenged calculation of Lessner's net worth).) *Cf. United States v. Pruden*, 398 F.3d 241, 249 (3d Cir. 2005) (examining record where district court did not explain the basis for imposing special condition of supervised release); *United States v. Warren*, 186 F.3d 358, 366-67 (3d Cir. 1999) (stating that in the absence of express findings on the record, the imposition of a special condition of probation may be affirmed if the record contains a "sufficient evidentiary basis" supporting the condition).

But even if we were to find that the District Court committed plain error by failing to make the express findings Lessner suggests it was required to make, there is no error here that "'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Stevens*, 223 F.3d at 242 (quoting *Olano*, 507 U.S. at 732). The record is clear that Lessner has the ability to make the restitution payments. The PSR, to which she did not object, lists assets which include $175,493.41 in cash, life insurance, stocks, and money owing; $70,000 in jewelry and art; and $2,568,000 in real estate holdings, including three rental properties and a vacation home. Although the PSR also reflects liabilities of $2,035,818, Lessner's net worth of $777,675.41 exceeds the combined lump-sum payments of $469,482.78. The record also reflects that Lessner and her husband have a monthly income of $8,090.00, far exceeding the $500 monthly restitution payment that she must make upon her release from prison.

Lessner also did not contest the PSR's findings that the government sustained an actual loss of $938,965.59 on 119 contracts, and that she was personally involved in each of those contracts. Nor did she contest the PSR's findings that "the defendant is capable of making a lump sum payment," and that "[i]t is apparent that the liquidation of some real estate could provide a partial lump sum payment towards the outstanding restitution amount" and "seem[s] to provide a tangible solution to the restitution debt." (J.A. at 521.) In its Statement of Reasons, the District Court expressly "adopt[ed] the presentence investigation report without change." (*Id.* at 558.) Under these circumstances, and in view of Lessner's considerable assets, we

find that no error, much less plain error, was committed by failing to make findings on the record.

## E.    Whether Lessner's Sentence Was Unreasonable

Lessner argues that the District Court, in sentencing her to 51 months' imprisonment, failed to consider pertinent factors under 18 U.S.C. § 3553(a) and imposed an unduly harsh sentence. We review a sentence for reasonableness, evaluating both its procedural and substantive underpinnings. *See United States v. Booker*, 543 U.S. 220, 261 (2005); *United States v. Cooper*, 437 F.3d 324, 329-32 (3d Cir. 2006).

To be procedurally reasonable, a sentence must reflect a district court's meaningful consideration of the factors set forth at 18 U.S.C. § 3553(a).[7] A district court "should set forth

---

[7] The factors that a district court must consider include:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed–

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .
. . . .
(5) any pertinent policy statement . . . issued by the

28

enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, ___ S. Ct. ___, 2007 WL 1772146, at \*12 (June 21, 2007). A sentencing court need not make findings as to each factor if the record otherwise makes clear that the court took the factors into account. *Cooper*, 437 F.3d at 329. Nor must the court consider arguments that clearly lack merit. *Id.* In some instances, a sentencing factor may overlap with a basis for a potential Guidelines departure. *United States v. King*, 454 F.3d 187, 194-95 (3d Cir. 2006).

The District Court's explicit discussion of the § 3553(a) factors was, admittedly, scant. Nevertheless, the record, which reflects extensive and thoughtful questioning by the Court over two days of hearings, more than adequately demonstrates the Court's meaningful consideration of the pertinent factors. By adopting the PSR and its calculation of the total offense level and criminal history category, the Court clearly considered "the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." § 3553(a)(4). Although the Court somewhat ambiguously indicated that its "hands are significantly tied" with respect to imposing alternative punishments (J.A. at 422), it also acknowledged that the Guidelines are "advisory, no question about it at this point in time" (*id.* at 418; *see also id.* at 419, 492). As the restitution order further made clear, the Court considered "the need to provide restitution" to the DLA, the victim of these offenses. § 3553(a)(7).

---

Sentencing Commission . . .;

. . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The District Court also considered "the history and characteristics of the defendant," § 3553(a)(1), ruling on Lessner's request for a reduction in the offense level for acceptance of responsibility and her motion for a departure on the ground of diminished capacity, and basing the latter ruling on extensive testimony taken at the December 14, 2005 hearing. (*See also* J.A. at 417 (acknowledging Lessner's "exemplary life" prior to these crimes).) The Court's pointed questions to Lessner during her plea allocution, moreover, erased any doubt as to its studied familiarity with the facts of the offenses. (*See id.* at 481-88; *see also id.* at 495 ("I have thought about this case for some time.").) *See* § 3553(a)(1) (requiring the court to consider "the nature and circumstances of the offense"). With regard to the seriousness of the offense and the need for adequate deterrence, *see* § 3553(a)(2)(A), (B), the Court noted the "multimillions and millions of dollars" at stake in government procurement and the imperative not to "allow people that do these particular type[s] of offenses to walk away." (J.A. at 455.) The Court also heard testimony that Verderame lost her job, and that Lessner's remaining buyers were required to undergo retraining and were not promoted. In a nod to avoiding unwarranted sentencing disparities, *see* § 3553(a)(6), the Court also found "that the Sentencing Commission did a thorough and adequate job in considering all of the potential affects [sic] that a sentence like this would have, not only on those who commit these type[s] of offenses, but also, more directly, to those who stand before the Court today, specifically, Ms. Lessner." (J.A. at 492.) *See Rita*, ___ S. Ct. ___, 2007 WL 1772146, at *12 ("Circumstances may well make clear that the judge rests his decision upon the Commission's own reasoning that the Guidelines sentence is a proper sentence (in terms of § 3353(a) and other congressional mandates) in the typical case, and that the judge has found that the case before him is typical."). There can be no question that the Court acknowledged the advisory nature of the Guidelines and took the pertinent § 3553(a) factors into account before imposing sentence.

In addition to being procedurally reasonable, a sentence must also be substantively reasonable. For a sentence to be substantively reasonable, a district court must apply the §

3553(a) factors reasonably to the circumstances of the case. *Cooper*, 437 F.3d at 330. A sentence that falls within the recommended Guidelines range, while not presumptively reasonable, is less likely to be unreasonable than a sentence outside the range. *Id.* at 330-31. The pertinent inquiry is "whether the final sentence, wherever it may lie within the permissible statutory range, was premised upon appropriate and judicious consideration of the relevant factors." *United States v. Schweitzer*, 454 F.3d 197, 204 (3d Cir. 2006). The party challenging the sentence bears the ultimate burden of proving its unreasonableness, *Cooper*, 437 F.3d at 332, and we accord great deference to a district court's choice of final sentence, *id.* at 330.

Lessner has failed to establish that her bottom-of-the-range sentence was substantively unreasonable. She argues that the District Court gave insufficient weight to such considerations as her lack of profit from her fraud, her diagnosis of depressive disorder, her exemplary work record, and the onerous nature of the restitution order. The decision by the Court, however, not to give such mitigating factors the weight that Lessner contends they deserve does not render her sentence unreasonable. *United States v. Bungar*, 478 F.3d 540, 546 (3d Cir. 2007). As is clear from the record, the Court was influenced by the significance and extent of Lessner's fraud, her obstruction, her supervisory position, her perceived lack of candor and persistent attempts to justify her conduct while refusing to accept personal responsibility for her actions, and the fact that she experienced depression only after she was confronted with evidence of her crimes and exposed to the possibility of imprisonment. At one point, the Court sought the government's views on a below-range sentence of three years, prompting the government to object that such a sentence would give Lessner "an implicit recognition that she accepted responsibility, because that's what a 36-month sentence is, the bottom of the guideline range that would have applied to the defendant had she accepted responsibility." (*Id.* at 471-72.) That we might have exercised our sentencing discretion differently, and we do not suggest that we would have done so, is irrelevant. *See Cooper*, 437 F.3d at 330. The Court did not err in concluding that the circumstances of this case did not mandate a sentence below the bottom of the

properly-calculated Guidelines range.

**F.      Whether the Restitution Order Violated the Excessive Fines Clause of the Eighth Amendment**

Lessner argues, finally, that the restitution order violated the Excessive Fines Clause of the Eighth Amendment because the award was grossly disproportionate to the gravity of her offense.  She failed to raise this argument before the District Court, so again we review for plain error.  *See United States v. Campbell*, 295 F.3d 398, 404 (3d Cir. 2002); *see also United States v. King*, 414 F.3d 1329, 1330 (11th Cir. 2005).

The Eighth Amendment to the United States Constitution provides as follows: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  The prohibition on excessive fines "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'"  *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609-10 (1993) (emphasis deleted)).  In the context of punitive forfeitures, the Supreme Court has held that an Eighth Amendment violation occurs when the forfeiture "is grossly disproportional to the gravity of a defendant's offense."  *Id.* at 334.  At least one court of appeals has recognized that restitution imposed under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, is punishment within the compass of the Eighth Amendment.  *United States v. Dubose*, 146 F.3d 1141, 1144 (9th Cir. 1998) (noting the remedial, deterrent, rehabilitative, and retributive purposes of mandatory restitution, and citing H.R. Rep. No. 104-16, at 5 (1995), and S. Rep. No. 104-179, at 18 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 931); *see also United States v. Siegel*, 153 F.3d 1256, 1259 (11th Cir. 1998) (concluding, for the same reasons, that restitution under the MVRA is "punishment" for purposes of the Ex Post Facto Clause).

Even assuming that mandatory restitution implicates the Eighth Amendment, there clearly was not, by any reasonable

measure, a constitutional violation here.  The District Court ordered restitution in the amount of the uncontested actual loss that the government sustained as a direct result of Lessner's fraudulent acts.  *Dubose*, 146 F.3d at 1145 ("[P]roportionality is inherent in a MVRA restitution order."); *see also United States v. Graham*, 72 F.3d 352, 358 n.7 (3d Cir. 1995) (dismissing as "without merit" defendant's argument that a restitution order under the Victim and Witness Protection Act, 18 U.S.C. § 3663(a), in the approximate amount of the actual loss violated the Excessive Fines Clause).  Moreover, the restitution order was not disproportionate to the statutory maximum fine of $250,000 per offense.  *See United States v. Newsome*, 322 F.3d 328, 342 (4th Cir. 2003) (finding no Eighth Amendment violation for restitution order that was not disproportionate either to the actual loss or to the statutorily authorized fine).  Finally, even if a defendant's hardship is a proper consideration, *contra Dubose*, 146 F.3d at 1146, neither the lump-sum payments nor the post-incarceration monthly payments imposed here exceed Lessner's ability to pay.  In short, the Constitution does not protect Lessner from "a less extravagant lifestyle."  (*See* J.A. at 521.)

## V.  Conclusion

The judgment of the District Court will be affirmed.