NYGAARD, Circuit Judge,
concurring in part and dissenting in part.
I agree with the majority and join them in affirming Fumo and Arnao’s convictions. I do, however, have two specific points of disagreement that cause me to dissent. First, the majority today vacates the sentencing decision of an experienced District Court judge because they claim, inter alia, he failed to recalculate the advisory Guidelines range after granting Fumo a downward departure. Without such a recalculation, the majority contends that it cannot reconstruct the District Court’s logic and reasoning and, therefore, finds it impossible to review the sentence. Although I question whether such a recalculation is even necessary, my reading of the record reveals that the District Judge did indeed recalculate the advisory Guidelines range after granting the downward departure.[1] Second, I believe the majority employs an incorrect standard to review this issue.
I.
A.
Quoting our opinion in United States v. Tomko, the majority states that “[t]he abuse-of-discretion standard applies to both our procedural and substantive reasonableness inquiries.” 562 F.3d 558, 567 (3d Cir.2009) (en banc) (citing Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)). That is a correct statement, as far as it goes. What the majority misses, however, is that “[o]ur standard of review differs based on whether the alleged sentencing error was raised below. If so, we review for abuse of discretion; if not, we review for plain error.” United States v. Russell, 564 F.3d 200, 203 (3d Cir.2009); see also United States v. *325 Vazquez-Lebron, 582 F.3d 443, 445 (3d Cir.2009) (holding that failure to raise procedural error before the district court resulted in plain error review); United States v. Watson, 482 F.3d 269, 274 (3d Cir.2007) (“[b]eeause [the defendant] did not object to this sentence on this ground during the sentencing hearing, we review the District Court’s judgment for plain error.”). Indeed, there was no question in Tomko that the appellant preserved its challenge to the issue under review: “[a]t the sentencing proceeding, the Government exhaustively asserted, directly in front of the District Court, that a probationary sentence would adversely affect general deterrence.” 562 F.3d at 568.
Even though the majority acknowledges that the Government “carefully took no position on whether the court had even announced a final guideline offense level,” it incorrectly defaults to the “abuse of discretion” standard of review. Maj. Op. at 315-16. Review for “plain error” is, instead, the appropriate standard of review because, despite ample opportunity to do so, the Government did not object to the District Court’s failure to perform a post-departure sentencing recalculation.
Our authority to remedy an improperly preserved error is strictly circumscribed.[2] Federal Rule of Criminal Procedure 52(b), as well as recent Supreme Court precedent, sets forth the proper standard of review applicable to unpreserved procedural sentencing errors: when a party does not preserve an argument in the district court, we review only for plain error. Rule 52(b) provides that, in the absence of proper preservation, plain-error review applies. See Fed.R.Crim.P. 52(b). To establish plain error, the appealing party must show that an error (1) was made, (2) is plain (i.e., clear or obvious), and (3) affects substantial rights. United States v. Lessner, 498 F.3d 185, 192 (3d Cir.2007). Even if an appellant makes this three-part showing, an appellate court may exercise its discretion to correct the error only if it “seriously affects the fairness, integrity or public reputation of judicial proceedings.” Id. (quoting United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).
The Supreme Court has specifically held that appellate courts can review unpreserved claims for plain error only. United States v. Olano, 507 U.S. at 731, 113 S.Ct. 1770. The Supreme Court has recently again instructed that, “[i]f an error is not properly preserved, appellate-court authority to remedy the error ... is strictly circumscribed” to plain-error review. Puckett v. United States, 556 U.S. 129, -, 129 S.Ct. 1423, 1428, 173 L.Ed.2d 266 (2009). Applying plain-error review in the sentencing context “serves worthy purposes,” including “inducting] the timely raising of claims and objections” to give the District Court an opportunity to correct error, if error there be. See Id. at 1428, 1433. Indeed, in United States v. Booker, the Supreme Court instructed that we are to “apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the ‘plain-error’ test” when reviewing sentences. 543 U.S. 220, 268, 125 S.Ct. 738,160 L.Ed.2d 621 (2005).
The Federal Rules expressly provide that “[a] party may preserve a claim of error by informing the court — when the *326 court ruling or order is made or sought— of the action the party wishes the court to take, or the party’s objection to the court’s action and the grounds for that objection.” Fed.R.Crim.P. 51(b) (emphasis added). Furthermore, the “objection must be specific enough not only to put the judge on notice that there is in fact an objection, but to serve notice as to the underlying basis for the objection.” United States v. Russell, 134 F.3d 171, 179 (3d Cir.1998). Here, the Government’s sole request at the end of the sentencing hearing was for a formal determination on prejudgment interest as it affects restitution. J.A. 1625. Nor did the Government avail itself of the opportunity to challenge the District Court’s sentencing calculations by filing a Rule 35(a) motion post-sentencing. It did file a response to Fumo’s Rule 35(a) motion, but failed to raise the issue, despite acknowledging that such motions can be used to attack technical errors that might otherwise require remand. J.A. 1635-36. See United States v. Miller, 594 F.3d 172, 182 (3d Cir.2010). Neither of these actions preserved the Government’s objections nor put the District Court on notice that the Government perceived a problem with its sentencing calculations post-departure.
The Government contends that it challenged the District Court’s failure to undertake a post-departure recalculation in its sentencing memoranda and at the sentencing hearing. Government’s Opening Brief at 4. There is no such challenge in the record. Neither in its own sentencing memoranda nor in its response to Fumo’s Rule 35(a) motion does the Government object to the failure to recalculate post-departure. The portion of the transcript the Government points to in its brief (J.A. 1558) is not an objection. Aside from the Government’s criticism of our opinion in Gunter, infra., this transcript portion is merely a discussion with the District Court regarding the application of departures or variances generally. I cannot find an objection to the District Court’s departure or its perceived failure to recalculate a Guidelines range noted there. And, of course, the Government could not have objected because the decision it claims on appeal to be error had not even been made. It is obvious to me why the Government did not object: it thought then, as I think now, that the District Court did not err.[3]
I further note that the Government has argued for plain error review time after time in situations where a defendant fails to object to a procedural error. See, e.g., United States v. Reevey, 631 F.3d 110, 112 n. 3 (3d Cir.2010); United States v. Bradica, No. 09-2420 (Government’s Brief); United States v. Bagdy, No. 08-4680 (Government’s Brief); United States v. Swift, No. 09-1985 (Government’s Brief). The government knows the rules and cannot have it both ways, arguing for plain error review when the defendant fails to object and abuse of discretion when it slips up. Although I would employ plain error review, I will meet my majority colleagues where they stand and review this issue for an abuse of discretion.
*327 B.
The majority faults the District Court’s application of step two of the Gunter analysis. Specifically, my colleagues fault the District Court for failing to announce a final Guidelines sentencing range after granting a departure and for failing to clearly articulate whether it was granting Fumo a departure or a variance. Maj. Op. at 316-17. I disagree with them on both points.
My reading of the record leaves me with no doubt as to the District Court’s decision or its reasoning: Judge Buckwalter granted Fumo a departure under § 5H1.11 for his good works. Fumo specifically moved for a departure on two fronts: his ill health and his good works. The District Court specifically denied his request to depart for ill health, but granted him a departure for his good works: “You worked hard for the public ... and I’m therefore going to grant a departure from the Guidelines.” J.A. 1622. Judge Buck-waiter reaffirmed this ruling by commenting “I did make a finding as to what the Guidelines are, but I’ve also added a finding that I’m going to depart from them.” J.A. 1623.
The District Court clarified its ruling even further after sentencing. Fumo filed a motion to clarify his sentence, given that Judge Buckwalter ruled on the departure request during a discussion of the § 3553(a) factors. In his motion, Fumo specifically asked the District Court whether it had intended to grant a variance rather than a departure. Interestingly, in reply, the Government argued that “the Court repeatedly stated that it decided to grant the departure motion based on public service.” Id. at 1635. The Government argued:
But, it was Fumo himself who requested that the Court grant a downward departure on the basis of his public service. In his letter to the Probation Office stating objections to the presentence report, dated June 23, 2009, Fumo’s counsel, while noting the possibility of both a departure and a variance, stated the following in a section entitled “Grounds for Departure”: “A downward departure for Mr. Fumo is appropriate because of Mr. Fumo’s health issues and his public service, either standing alone or in combination.” Letter at 15. See also id. at 16 (“Mr. Fumo’s record is not merely ordinary, rather it is extraordinary. As such, § 5H1.11 it [sic] is a valid basis for a downward departure.”). Next, at a hearing on July 8, 2009, regarding the guideline calculation, Fumo’s counsel strenuously advanced this position. In response, on July 9, 2009, the Court issued an order which stated in part, “As it now stands, the offense level is 33. The court has already indicated that no departure will be granted based upon health, but a decision on a departure based upon good works will be reserved until time of sentencing on July 14, 2009. Then, at the sentencing hearing on July 14, 2009, the Court repeatedly stated that it decided to grant the departure motion based on public service. As the sentencing hearing for Ruth Arnao on July 21, 2009, the Court reiterated that it had given a departure to Fumo while stating that it would not similarly depart from Arnao’s guideline range, but rather would grant a variance.”
J.A. 1635. Although the Government had no trouble finding the District Court’s intention to grant a downward departure crystal clear at sentencing, on appeal it disingenuously waffles on the issue and points to a statement that Judge Buckwalter added to his official “Statement of Reasons” for sentencing:
I next determined whether there should be a departure from the guidelines and announced at the sentencing hearing that there should be based on my find *328 ing extraordinary good works by the defendant. I did not announce what specific guideline level the offense fell into; that is to say, the precise number of levels by which I intended to depart because until I considered all other sentencing factors, I could not determine in precise months the extent that I would vary from the guidelines.
Having advised counsel of the offense level that I found and my intent to depart downward, I then proceeded to hear from counsel their respective analyses of what an appropriate sentence should be.
The procedure I followed was perhaps more akin to that associated with a variance than a downward departure because I never announced nor have I ever determined to what guideline level I had departed. Ultimately, the argument over which it was elevated form over substance.
App. at 185-86. My colleagues seize upon this statement, finding the District Court’s use of the words “vary” and “depart” confusing. Indeed, the Majority admits that but for this word choice, they would have found Judge Buckwalter’s intentions clear. Reviewing for abuse of discretion, I find none. The record is sufficiently clear for me to bend toward the District Court and defer to its reasoning.
I agree with Fumo here and think this statement clears up any possible ambiguity instead of creating one. Judge Buckwalter identifies the standard for granting a departure based on good works — extraordinary behavior and/or actions. See United States v. Kulick, 629 F.3d 165, 176 (3d Cir.2010). Furthermore, the judge’s statement indicates that he granted a downward departure for good works, not a variance: “I next determined that there should be a departure from the guidelines ...” Indeed, the sentence the majority points to as generating all the confusion (“I did not announce what specific guideline level the offense fell into; that is to say, the precise number of levels by which I intended to depart because until I considered all other sentencing factors, I could not determine in precise months the extent that I would vary from the guidelines.”) contains a concrete statement that the District Court was granting a departure. I read the use of the word “vary” in this particular phrase not hyper-technically or as a term of art, but rather in its everyday sense, meaning to alter or adjust. I am neither confused nor unable to ascertain whether a departure or a variance was granted here. It was a departure, clearly.
And, even were I in need of further clarification, I need turn no further than to Ruth Arnao’s sentencing hearing. The record there firmly establishes that the District Court knew it was granting Fumo a departure. At Arnao’s sentencing hearing, Judge Buckwalter specifically differentiated between the departure he gave Fumo and the variance he awarded Arnao: “So the fact that you, Ms. Arnao, at least did something in your lifetime to help other people, to help other charities, it’s not enough for me to depart from the guidelines, but it’s certainly enough for me to consider to vary in some way from what the guidelines suggest here.” J.A. 1836.
Let us not split hairs. Judge Buckwalter granted Fumo a § 5H1.11 departure and I see no reason to vacate and remand Fumo’s sentence because the District Court’s intentions were unclear.
My colleagues also fault Judge Buckwalter for failing to conduct a post-departure recalculation of the advisory sentencing range. I have two points of disagreement with them here. First, to my mind, the requirement of a post-departure recalculation of the advisory sentencing range, post-departure, injects a superfluous layer of computation into an already unnecessar *329 ily hyper-technical process. Second, Judge Buckwalter did recalculate the sentencing range post-departure.
In United States v. Gunter, 462 F.3d 237, 247 (3d Cir.2006), we established a relatively straightforward procedure for District Courts to follow in sentencing a criminal defendant post -Booker. First, district courts are to calculate a defendant’s sentencing Guidelines range precisely as they would have pr e-Booker. Id. Second, district courts were instructed to rule on any motions and state on the record whether they were granting a departure and, if so, how such a departure affects the initial Guidelines calculation. A district court should also take into account our pr e-Booker case law, which continues to have advisory force. Id. Third and finally, district courts are required to exercise their discretion by considering the relevant 18 U.S.C. § 3553(a) factors in setting their sentences, regardless of whether it varies from the original calculation. Id.
Although Gunter requires a district court to calculate the Guidelines range, that range is only “a starting point and initial benchmark” of the sentencing analysis. United States v. Grober, 624 F.3d 592, 609 (3d Cir.2010) (citing Gall v. United States, 552 U.S. at 49, 128 S.Ct. 586 (“As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.”)). I see no requirement that a district court, after concluding that a departure is warranted, recalculate and specify a new adjusted sentencing range. Gunter only requires that a district judge indicate how the departure “affects the Guidelines calculation.” Gunter, 462 F.3d at 247. A statement indicating whether the departure would go above or below the previously determined sentencing range would suffice.
The majority finds additional error in what they perceive as the District Court’s failure to recalculate Fumo’s advisory Guidelines range after announcing it would grant the former state senator a departure. I find no such error. Judge Buck-waiter did recalculate the advisory range, albeit in terms of months rather than levels. The advisory Guidelines range was recalculated to be 121 to 151 months. He adopted this range, thereby satisfying step one of the Gunter analysis. At step two, he ruled on departure motions, announcing a downward departure to Fumo for his good works under § 5H1.11 and denying the Government’s requested upward departure. Judge Buckwalter then reviewed the § 3553(a) factors and decided against any variances, satisfying step three. He then announced a sentence of fifty-five months, revealing a sixty-six month departure.
The recalculation the majority misses is easily found — a departure of sixty-six months from the 121 month bottom of the advisory Guidelines range left Fumo with a fifty-five month sentence. It was not procedurally unreasonable for the District Court to determine the extent of its departure in terms of months instead of levels. See United States v. Torres, 251 F.3d 138 (3d Cir.2001). My colleagues try to brush Torres aside as a “pre-Booker case.” Maj. Op. at 316. This they cannot do. Torres retains vitality, post -Booker, as an advisory decision which we require district courts to consult. See Gunter, 462 F.3d at 247 (noting that, at Gunter's first and second step, our pr e-Booker case law is still to be considered, given its advisory force.); United States v. Floyd, 499 F.3d 308, 312, n. 6 (3d Cir.2007) (citing Torres for the factors to be considered in a § 5K1.1 departure post-Booker); see also Vazquez-Lebron, 582 F.3d at 445.
Further, requiring the District Court to recalculate a sentencing range based on its sixty-six month departure is unfair be *330 cause the sentencing ranges would overlap. As Fumo pointed out, a sixty-six month departure would have put him into levels 23 and 24, leaving the District Court with a quandary: which level’s sentencing range should it refer to under § 3553(a)(4)? Asking the sentencing judge to choose a level comes close to requiring him to conceptualize the departure in terms of levels, which, of course, he does not have to do. See Torres, 251 F.3d at 151.
Looking at this another way, I can easily find a recalculated sentencing range on this record. During the sentencing proceedings, the District Court granted Fumo’s motion for a downward departure based on his good works and then chose, in the context of considering the required statutory factors, a sentence that adequately accounted for this finding — fifty-five months. In sentencing Fumo to fifty-five months, Judge Buckwalter implicitly announced a departure of eight levels, and then selected a corresponding range (51 to 63 months) at the § 3553(a) stage. Id. (“a departure measured in months is easily translated into offense levels.”). I would not require more.
Judge Buckwalter complied with the requirements we have articulated for sentencing. He began by calculating an initial Guidelines range, a range which neither party argued he arrived at incorrectly. He then announced, at step two, that he would grant Fumo’s motion for a departure, thereby indicating that his ultimate sentence would be below the advisory Guidelines range. At step three, he reviewed the § 3553(a) factors, determined he would not grant a variance, and announced a sentence of fifty-five months. The District Court touched all the procedural bases and consequently, did not err.
c.
Finally, even were I to agree with the majority and find procedural error in the District Court’s failure to recalculate the advisory Guidelines range post-departure, I would still dissent from vacating the sentence. I see no evidence that the District Court would have arrived at another sentence had it engaged in the additional post-departure calculation now required by the majority. As I stated before, Judge Buckwalter presided over this trial for five months and knows more about Fumo than any of us. He granted Fumo a departure based on his good works and, in the context of full consideration of the § 3553(a) factors, chose a sentence that adequately accounted for his findings — fifty-five months imprisonment, a fine and restitution. This sentence would have been no different had the District Court announced its departure in terms of levels (8) and then selected a sentence from the corresponding range (51 to 63 months) at the § 3553(a) stage. This is exactly what Judge Buckwalter may do on re-sentencing to correct what the majority has perceived to be procedural error.[4]
I recognize that if we find procedural error at any step, we will generally “remand the case for re-sentencing, without going any further.” United States v. Merced, 603 F.3d 203, 214 (3d Cir.2010). This approach, however, opens us up to serial appeals on procedural error issues before we reach our substantive reasonableness review. United States v. Lychock, 578 F.3d 214, 219-20 (3d Cir.2009) (finding procedural error yet proceeding to analyze substantive reasonableness). See also United States v. Stewart, 597 F.3d 514, 525 (2d Cir.2010) (Cabranes, J., dissenting sur denial of rehearing). Here, *331 the record clearly demonstrates that the district court departed, why it departed, and the extent to which .it departed.
II.
I join my colleagues, however, in affirming Fumo’s and Arnao’s convictions. As the majority opinion relates, Fumo argues that the District Court abused its discretion in not dismissing juror Eric Wuest as a consequence of Wuest’s Internet postings during the trial and jury deliberations.[5] Fumo also charges the District Court with abusing its discretion by refusing to question the other jurors about their exposure to juror Wuest’s postings. I agree with my colleagues and find no abuse of discretion. I write separately, however, to briefly highlight the challenges that the proliferation of social media presents to our system of justice.
“The theory of our system,” wrote Justice Holmes, “is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.” Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907). Justice Holmes, of course, never encountered a juror who “tweets” during the trial. Courts can no longer ignore the impact of social media on the judicial system, the cornerstone of which is trial by jury. We have always understood that, although we operate from the presumption that a jury’s verdict will be just and fair, jurors themselves can be influenced by a host of external influences that can call their impartiality into question. The availability of the Internet and the abiding presence of social networking now dwarf the previously held concern that a juror may be exposed to a newspaper article or television program. The days of simply instructing a jury to avoid reading the newspaper or watching television are over. Courts must be more aggressive in enforcing their, admonitions.
The Internet, especially social networking sites like Facebook and Twitter, have created a society that is “connected” at all times. Facebook, created in 2004, is arguably the most popular social networking platform. Facebook allows people to communicate with their family, friends and coworkers and to share information through the digital mapping of people’s real-world social connections. See Facebook, Faetsheet, available at http://www.facebook.com/ press/info.php (last visited July 18, 2011). Currently, Facebook has over 500 million registered users, and these users spend over 700 billion minutes per month using the site. Id. The average user is connected to 80 community pages, groups or events. Id. Twitter was created in 2006 and is a real-time information network that lets people share and discuss what is happening at a particular moment in time. See Twitter, available at http://twitter.com/ about (last visited July 18, 2011). Twitter has approximately 100 million users and differs from Facebook by allowing its users to send out a text message from their phones (up to 140 characters) to their followers in real time. Id. It is estimated that Twitter users send out over 50 million of these messages (or, Tweets) per day. Id. In other words, the effects and affects of electronic media are pervasive.
Jurors are not supposed to discuss the cases they hear outside the jury deliberation room. However, we know that jurors have used Twitter and Facebook to discuss their service. For example:
*332 * In an Arkansas state court, a defendant attempted to overturn a $12.6 million verdict because a juror used Twitter to send updates during the trial. One post stated “Oh, and nobody buy Stoam. It’s bad mojo and they’ll probably cease to exist now that their wallet is 12m lighter.”[6]
* In Maryland, Baltimore Mayor Sheila Dixon sought a mistrial in her embezzlement trial because, while the trial was going on, five of the jurors became “Facebook friends” and chatted on the social networking site, despite the Judge’s instructions not to communicate with each other outside of the jury room. Dixon’s attorneys argued that these “Facebook friends” became a clique that altered the jury dynamic.[7]
* In the United Kingdom, a case was thrown out because a juror sitting on a criminal matter wrote on her Face-book page that she was uncertain of the defendant’s guilt or innocence and created a poll for her friends to vote.[8]
The examples of this type of behavior are legion. Not only are jurors tweeting, but they have been conducting factual research online, looking up legal definitions, investigating likely prison sentences for a criminal defendant, visiting scenes of crimes via satellite images, blogging about their own experiences and sometimes even reaching out to parties and witnesses through “Facebook friend” requests. See David P. Goldstein, The Appearance of Impropriety and Jurors on Social Networking Sites: Rebooting the Way Courts Deal with Juror Misconduct, 24 Geo. J. Legal Ethics 589 (2011).
Of course, jurors doing independent research and/or improperly commenting on a case are not new phenomena. The Internet and social networking sites, however, have simply made it quicker and easier to engage more privately in juror misconduct, compromise the secrecy of their deliberations, and abase the sanctity of the decision-making process. As we have seen in this case, jurors can use services like Face-book and Twitter to broadcast a virtual play-by-play of a jury’s deliberations.
Technology, of course, will continue to evolve and courts must creatively develop ways to deal with these issues. In addition to the endorsement the majority opinion gives the recently proposed model jury instructions, I would encourage district courts to go further. We must first educate jurors that their extra-curial use of social media and, more generally, the Internet, damages the trial process and that their postings on social media sites could result in a mistrial, inflicting additional costs and burdens on the parties specifically, and the judicial system generally. I suggest that district courts specifically caution jurors against accessing the Internet to do research on any issues, concepts or evidence presented in the trial, or to *333 post or seek comments on the case under review.
Indeed, I can envision a situation where a district judge might be called upon to sanction jurors for inappropriate Internet research or postings on social networking sites that threaten the integrity of the trial. Such sanctions are not unheard of: a juror was recently fined $250.00 and ordered to write a five-page essay on the Sixth Amendment by a Michigan judge for posting biased comments about the case on Facebook. Jameson Cook, VIDEO: Dismissed Juror Ordered to Write Essay About Sixth Amendment, Daily Tribune Review, September 2, 2010, available at http://www.dailytribune.com/articles/2010/ 09/02/news/doc4e806a7b7e451383425678.txt (last visited July 19, 2011). The threat of either fining jurors or holding them in contempt of court due to Internet misconduct may become necessary to deter it and convey a public message that the judicial system cannot tolerate such behavior. Finally, the Bar also bears some responsibility. During voir dire, attorneys should routinely question jurors on their Internet usage and social networking habits. A juror’s Internet activities have the potential to result in prejudice against a defendant, and counsel must expand the voir dire questioning to include inquiries into online activity.
Facebook, Twitter, and other Internet communication sites are a boon to the law and the courts. Improperly used, however, they could do real harm. Problems with jurors’ continued use of these sites and others during their service must be anticipated and deterred.
III.
In conclusion, I would affirm Fumo’s and Arnao’s convictions. I would also affirm the sentences imposed by the District Court.

. My dissenting opinion will be confined to my disagreement with their finding of procedural error as to the District Court's departure ruling and Guidelines calculation. I also dissent from those portions of the majority opinion that find the District Court’s classification of loss to be an abuse of discretion. I further disagree with the majority and cannot find the District Court’s refusal to apply sentencing enhancements for acting on behalf of a charity (U.S.S.G. § 2B1.1(b)(8)(A)) and for the use of sophisticated means (U.S.S.G. § 2B 1.1 (b)(9)(C)) to be an abuse of discretion. Because I dissent from the majority’s resolution of the loss calculation issues, I dissent from that portion of the majority opinion that vacates Arnao's sentence as well. I join Judge Fuentes, however, in finding no abuse of discretion in the District Court’s loss calculations concerning the tools and equipment purchased by Citizen’s Alliance (Maj. Op. at 311) and the painting of the sailing vessel, Gazela (Maj. Op. at 312-13). Finally, I join Judge Fuentes, and find no abuse of discretion with the District Court’s grant of variances to Arnao.

. As the Supreme Court has noted, there is good reason our review is circumscribed: “anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error could be fatal.” Puckett v. United States, 556 U.S. 129,-, 129 S.Ct. 1423, 1428, 173 L.Ed.2d 266 (2009) (quoting United States v. Padilla, 415 F.3d 211, 224 (1st Cir.2005) (en banc) (Boudin, C.J., concurring)).

. The majority's reliance on our decision in United States v. Sevilla, 541 F.3d 226 (3d Cir.2008) provides them no cover. In Sevilla, we stated that " '[a]n objection to the reasonableness of the final sentence will be preserved if, during sentencing proceedings, the defendant properly raised a meritorious factual or legal issue relating to one or more of the factors enumerated in 18 U.S.C. § 3553(a).’ ” Id. at 231 (quoting United States v. Grier, 475 F.3d 556, 571 n. 11 (3d Cir.2007) (en banc)). But Sevilla is readily distinguishable on its facts. In Sevilla, the defendant-appellant had raised his legally recognized grounds for downward variance in a written sentencing memorandum prior to the sentencing hearing. 541 F.3d at 231. The Government here never raised the issue of the lack of a post-departure recalculation before sentencing or afterward.

. Indeed, why put the District Court through a complete re-sentencing? If the majority finds the record confusing, why not, instead of vacating the judgment of sentence, simply remand for clarification?

. An. audio recording of the in-chambers examination of Juror Wuest by the District Court and counsel is online and available for listening. See http://www.philly.com/ inquirer/specia]/4133127.html and http:// www.philly. com/inquirer/special/41331457. html.

. See Renee Loth, Mistrial by Google, Boston Globe, Nov. 6, 2009, at A15, available at http://www.boston.com/bostonglobe/editoriaL opinion/oped/articles/2009/ll/06/mistrial_by_ google/ (moving for a mistrial and reversal of a $12 million judgment based on a juror's Twitter posting stating: "oh, and nobody buy Stoam. Its [sic] bad mojo and they'll probably cease to Exist [sic], now that their wallet is 12m lighter.”) (last visited August 1, 2011).

. Brendan Kearny, Despite Jurors Warning, Dixon Jurors Went on Facebook (2009), available at http://mddailyrecord.com/2009/12/02/ despite-judgeS%ors-warning-dixon-jurorswent-on-facebook/ (last visited August 1, 2011).

.Urmee Khan, Juror Dismissed From a Trial After Using Facebook to Help Make a Decision, Telegraph.co.uk, Nov. 24, 2008, http:// www.telegraph.co.ulc/news/newstopics/ lawreporls/3510926/Juror-dismissed-from-atrial-after-using-Facebook-to-help-make-adecision.html (last visited August 1, 2011).